The MUTUAL LIFE INSURANCE COM-
PANY OF NEW YORK, Appellant,

v.

William H. ELLISON, Appellee.

No. 15338.

United States Court of Appeals
Fifth Circuit.

June 15, 1955.

Rehearing Denied July 12, 1955.

Norman Stallings, R. W. Shackleford, Shackleford, Farrior, Shannon & Stallings, Tampa, Fla., of counsel, for appellant.

Walter G. Ramseur, Jack Clark, Ramseur, Bradham & Clark, St. Petersburg, Fla., of counsel, for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges

TUTTLE, Circuit Judge.

Appellant here appeals from a judgment of the court below resulting from a trial in which the jury was waived, permitting appellee to recover as for a total disability under the disability provisions of two life insurance policies issued by appellant.[1]

■ Since this court can reverse the judgment below only if we find such judgment clearly erroneous, we set out the facts generally as contended for by appellee. With slight modification, required by our own careful reading of the record, the following statement is taken from appellee's brief. There will be added below certain additional facts not commented on in appellee's recitation.

The appellee, William H. Ellison, operated a hardware business for a few years prior to World War I; his business was not very successful; he entered into the military service and was in service approximately eighteen months; after his discharge he acted as a salesman for Firestone Rubber Company for approximately one year; he did not make much of a success as a salesman; he took a two year business course in shorthand and typewriting; he could never qualify as a stenographer due to an injury to a hand because of a pistol bullet which has disabled his thumb for many years.

He took the same identical course as a Doctor of Medicine and graduated as an osteopathic physician in 1926; his course included chemistry and materia medica, and he was as well qualified as any Doctor of Medicine to determine the effect of chemicals upon the human body; he began his practice as an osteopathic physician in the year 1926; he was admitted to practice medicine in the State of Florida, the State of Maine and the State of Missouri; he practiced in the winter months in St. Petersburg, Florida, from 1927 to 1947, with the excep-

---

[1]. "Disability shall be considered total when there is any impairment of mind or body which continuously renders it impossible for the Insured to follow a gainful occupation.

"Total disability shall, during its continuance, be presumed to be permanent;

\* \* \* If such disability has existed continuously for ninety days.

"The entire and irrecoverable loss of the sight of both eyes, or of the use of both hands or both feet or one hand and one foot, will be considered total and permanent disability."

tion of one year when he made a trip to California, and one other year when he looked after his wife's father exclusively.

For a period of approximately six to eight years he took a course in rectal surgery (proctology) at the Dover Clinic in Boston; for some fifteen years his practice was devoted exclusively to rectal surgery; as an osteopathic physician his practice from 1927 to 1947 consisted either of body massage or surgery.

In the early 1940's the palms of his hands and his fingers became infected in some fashion with a disease which caused substantial irritation; it grew progressively worse as the years went on until it became so acute in 1947 that he had to completely discontinue his practice as a rectal surgeon; and any surgeon has to scrub his hands with a stiff brush in a strong sterilizing solution before every operation, and Dr. Ellison's condition was such that he could not do so; the testimony showed that any sterilizing solution would cause severe irritation to his hands.

While Dr. Ellison never specialized in Dermatology, that is to say, he was never a skin specialist, he said he read all of the medical books on dermatology down to the date of the trial and said he used every conceivable remedy that had come to his attention; nothing that he tried gave him any appreciable relief and he said the majority of things that he tried aggravated his condition.

Dr. Ellison had a fast boat and liked to go boating and fishing; he played golf on every occasion that he could; he also played tennis; he enjoyed a social game of cards and social contacts with his friends; after the diseased condition of his hands became acute he had to give up golf, tennis, fishing, boating and even playing cards, because he was afraid that his friends would fear he might cause an infection in the hands of his friends, handling the cards that he himself had handled.

He testified that if he used any heavy object like a rake or shovel and would work to any extent, he would inflame the condition of his hands; he testified that he was wholly incapacitated from carrying on the duties of an osteopathic physician or surgeon in that he definitely could not give body massage or perform rectal surgery; and that the condition of his hands has grown progressively worse from the early 1940's to 1947 and has continued without interruption since 1947.

He talked to various doctors who were friends of his at the Dover Clinic and exhibited his hands to them; he claimed that he received medical treatment from other doctors but that in the main he was his own physician.[2]

Prior to his sixtieth birthday he was advised by the insurance company that the disability provisions of his policy would lapse on his sixtieth birthday; this was the first realization that he had of the disability provisions of the policy and he immediately filed a formal claim for disability and a proof of loss showing that he had disability of both of his hands; the insurance company caused the matter to be investigated by an agent who came to the home of Dr. Ellison, examined his birth certificate, looked over his office and examined his hands; and the company thereafter denied his claim for disability. There is no issue here as to failure to file proof of loss in time.

The two insurance policies were identical; both of them show that at the time of application for insurance in 1928 Dr. Ellison specified that he was an osteopathic physician. Both of the policies provide that the company had a right to call upon the insured to submit to medical examination, and that the appellant never required the appellee to submit to any medical examination but denied his claim for disability benefits.

Additional facts, not included in appellee's statement are: That Dr. Ellison

2. For the complete lack of confidence he had in his own ability to treat this con-

dition see the discussion of his appraisal of Dr. Muir below.

did not at any time, either before or after the period of his claimed disability, call upon any physician trained as a skin specialist and undergo a course of treatment for the condition of his hands. He did not talk to a dermatologist until after the filing of his claim of disability in 1951; he then went to an experienced skin specialist, a Dr. Wilson, primarily to have colored photographs made of his hands. Dr. Wilson gave him two prescriptions which appellee said he tried but which caused pain and inflammation and he stopped using them and did not consult Dr. Wilson any further, but went back to get additional photographs two years later, shortly before the trial. Dr. Wilson testified that Dr. Ellison could not carry on massage and surgery in the state of his hands when he saw them in 1951 and 1953; he testified that in his opinion the condition could be healed; he further testified that in his opinion the condition of appellee's hands would not have interfered with his practice of medicine other than when he had to use his hands in practice; that he had at least one physician friend who carried on a fairly successful medical practice with this same condition present; Dr. Ellison testified himself that he had made no effort to find any kind of employment or occupation;[3] there was much testimony by doctor associates that there was no substantial difference between the condition of Dr. Ellison's hands before and after May 1, 1947, and much testimony by neighbors that he carried on many of the normal activities around his house and yard, perhaps engaging much more frequently than the average in washing his three or four automobiles, mostly with a long handled brush, but also that he freely used the hose and occasionally used rags in the process; finally it is testified that he drove his cars frequently, including times when there were others in the car with him, evidencing a lack of disability as to this particular activity; Dr. Ellison was not competent to diagnose or treat the condition on his hands and he did not take reasonable means to effect a cure if one could be worked.

■ We find that the judgment of the trial court must be reversed because it was clearly erroneous in that it is too clear for argument that neither before nor after the realization that he might have a claim for disability did Dr. Ellison make the slightest effort to submit his condition to a trained physician to treat his hands; it is equally clear that there was no evidence that with a proper diagnosis and regimen the condition would not yield to treatment, and it was without dispute that Dr. Ellison made not the slightest effort to test his ability to enter a gainful occupation in which he might derive earnings for either his knowledge as a physician with all the training received as a doctor of medicine, which he testified he had, or his general abilities as an educated and normally endowed person.

The only findings of fact by the trial court that need be considered in our discussion here are stated in the margin.[4]

3. "Q. Doctor, what effort have you made to test your ability to engage in some line of gainful occupation since 1947? A. I have no idea what I could do without the use of my hands.

"Q. Have you made any effort to find out or to test your ability to work in some line of gainful occupation? A. I don't have any idea what I could do without using my hands.

"Mr. Shackleford: Read him the question. (The last question was read by the reporter as follows: "Have you made any effort to find out or to test your ability to work in some line of gainful occupation?")

"The Witness: No.

"By Mr. Shackleford: Q. You have not made any effort to get any position? A. No.

"Q. Of any kind—have you? A. No.

"Q. Or to go into any line of business? A. No."

4. "4. That the plaintiff took various treatments for the diseased condition of his hands without receiving any beneficial effect from such treatment.

"5. That both of plaintiff's hands became cracked and covered with scale; and that prior to May 1, 1947, plaintiff sustained the entire irrevocable loss of the use of both hands, insofar as the con-

It is not difficult to achieve a feeling of sympathy for a professional man who, because of a specific type of injury or disease is disqualified from continuing in his chosen profession, even though, as here, he was either unable or unwilling to testify as to a single year of his practice to even an approximation of his income—whether it was $1,000 or $10,000. The insurance policies sued on, however, did not undertake to assure appellee that he could continue his practice as a rectal surgeon through age 60. They provided payments to be made in the event of total disability which the policies defined: "Disability shall be considered total when there is an impairment of mind or body which continuously renders it impossible for the insured to follow a gainful occupation."

■ Of course, the appellant does not contend, and we would not hold, that in order to recover, a policyholder would have to be bedridden or in a condition of complete helplessness. We are bound by the law of Florida in the construction of the policies. The appellee cites two [5] and the appellant cites two different [6] Florida cases which we take as an expression of the Florida law in this respect. These cases do not greatly differ in their treatment of the rule. The latest of them is New York Life Insurance Co. v. Bird, 152 Fla. 532, 12 So.2d 454, 457, cited by appellee. Pertinent parts of the charge given by the trial court in that case, approved by the Florida Supreme Court, follow:

"'In order that the plaintiff should be totally disabled and wholly prevented from performing any work or following any occupation or engaging in any business for remuneration or profit it is not necessary that it be proved beyond a reasonable doubt that the plaintiff is bedridden as a result of the injury or disease or reduced to a condition of complete helplessness, but he may be so disabled within the meaning of the law if he be so incapacitated by such injury or disease that he cannot within the range of his normal ability, taking into consideration his education, training and work, and his physical condition, earn wages or profit in his customary ,occupation or that he cannot engage in any gainful occupation in the customary manner.'

\* \* \* \* \*

"'In determining whether or not the plaintiff is totally disabled the proper question is not whether he can do substantially all of those things he did involving a gainful occupation; but whether or not he can substantially perform the duties of some occupation for which he is qualified.'

---

duct of his profession as a rectal surgeon was concerned, in that it became impossible for plaintiff to sterilize his hands with strong antiseptics before performing surgery, without causing intense pain and inflammation to the diseased condition of his hands; and plaintiff had to abandon his profession as an osteopathic physician and surgeon.

"6. That prior to May 1, 1947, the plaintiff, William H. Ellison, became so incapacitated that he could not, within range of his normal ability, take [sic] into consideration his education, training and work and his physical condition, earn wages or profits in his customary profession nor engage in any gainful occupation in a customary manner, and that he has continuously been so disabled from May 1, 1947, down to the date of the trial of this suit.

\* \* \* \* \*

"11. That the plaintiff, William H. Ellison, became totally and permanently disabled, within the terms of each of said policies of insurance, prior to May 1, 1947, and has continued to be totally and permanently disabled within the terms of each of said policies of insurance from May 1, 1947, to the date of the trial of this suit."

5. New England Mutual Life Ins. Co. v. Huckins, 127 Fla. 540, 173 So. 696, 697; New York Life Ins. Co. v. Bird, 152 Fla. 532, 12 So.2d 454.

6. Equitable Life Assurance Soc. v. McKeithan, 119 Fla. 486, 160 So. 883; Equitable Life Assurance Soc. v. Wiggins, 115 Fla. 136, 155 So. 327.

" 'If you find that the plaintiff, within the range of his normal ability, taking into consideration his education, training and physical condition, can perform some work, follow some occupation or engage in some business for remuneration or profit, you should find a verdict for the defendant insurance company.' "

There is a further legal principle that must be considered in determining whether there exists such permanent and total disability, and that is "it is the duty of one suffering from causes that disable him to avail himself of all reasonable means and remedies to remove his disabilities."[7] This is a rule of good morals and fair dealing that understandably finds its way into the law on the subject.

Applying the facts in this case to the legal principles just enumerated, we are convinced that findings 4, 5, 6 and 11 of the trial court are not supported by any substantial evidence.

As to the finding that "the plaintiff took various treatments for the diseased condition of his hands without receiving any beneficial effect from such treatment," it is impossible to read the record without concluding that although appellee "tried everything" he did not at any time "take a treatment" in the sense in which the words are usually used. The doctor apparently attempted to steer a course between being a well trained medical man who was competent to treat himself, but who might now be able to use his medical training for profitable ends without engaging in surgery, and a man who, while 30 years ago receiving the same medical training as medical doctors, had so far specialized as not now to have any general medical skill aside from proctology. In any event he demonstrated either that he had absolutely no competence in the field of dermatology or that he was not seriously interested in "availing himself of all reasonable means and remedies to remove his disability." He testified that while suffering the maximum from the condition of his hands, he received hundreds of free samples every month from pharmaceutical houses and he "tried them all." He said he showed his hands to every doctor he came in contact with, but not until after he made his claim for disability did he ever consult a skin man. He admitted his own incompetence when he testified about talking to a Dr. Muir who, according to earlier depositions, had been named as a doctor he had consulted and who had given him medication. "I don't consider that you consult a man professionally that isn't a dermatologist *and knows nothing more than you do about the condition*— just to look at it," (emphasis added) and again he said: "Well, right now, I'm trying to make the differentiation between going to Dr. Wilson who is a dermatologist, and talking to some other man that's a rectal surgeon, *the same as myself.* (Emphasis added.) Do you consider it professional going to a person professionally that is not in that business—if you just show him your condition?" He thus, very properly, classed Dr. Muir and himself as "nonprofessionals" so far as his trouble was concerned.

When he did finally see a specialist, it was Dr. Jensen, a radiologist, not even a dermatologist, while he was with his wife for a treatment she was receiving for a skin condition on her feet. The amazingly casual way in which this man, who claimed medical knowledge, approached the treatment of a condition that he says constituted a totally disabling disorder is again apparent.[8] Dr.

---

7. Mutual Life Ins. Co. of New York v. Knight, 130 Fla. 733, 178 So. 898, 900; Cf. Pacific Mutual Life Ins. Co. of California v. McCaskill, 126 Fla. 82, 170 So. 579. See also United States v. Dupre, 5 Cir., 110 F.2d 315.

8. "Q. Now will you give us the details of that consultation, please? A. There wasn't much conversation. My wife was over there with the same kind of condition, taking x-ray treatments; and I showed him my hands and he said, 'Well,

Jensen gave him one X-ray treatment without diagnosing his condition and then he went to see Dr. Wilson at Dr. Jensen's suggestion, to have some photographs taken. Finally, four years after the date on which appellee claimed to have totally disabling skin disease, he went to a dermatologist, and even then it appears that he just happened to get in the hands of a dermatologist because he went there only because Dr. Jensen said to him "You have an insurance policy covering this case and *Dr. Wilson is an expert at taking photographs*, and you go over and see him." (Emphasis added.)

It turned out that Dr. Wilson was much more than an expert in taking pictures. He had all the requirements that the twelve or fifteen others to whom Dr. Ellison had casually shown his hands lacked. He had Ellison go to a pathologist, and later gave him a diagnosis of infectious eczematoid dermatitis, which he testified he thought was curable, but in the meantime he gave him two prescriptions that caused him so much pain that he stopped using them. Then the following testimony of Ellison is probably the most enlightening passage in the record and demonstrates convincingly that no finding of total and permanent disability could be sustained:

"Q. Now, Doctor, you did not get a good result? A. No.

"Q. From either of the prescriptions? A. No.

"Q. Did you report back and so inform Dr. Wilson? A. No. I didn't want to embarrass him to that extent.

"Q. You felt that it would embarrass him because he had not cured your condition? A. He didn't promise anything in the way of a cure.

"Q. Why did you feel, Doctor, that it would embarrass him for you to return for further treatment and to advise him professionally that you had not gotten a satisfactory result from his prescription? A. Because I didn't want to pay another $20.00.[9]

"Q. He charged you $20.00? A. Yes.

"Q. And your reason for not returning to him and advising him that you hadn't gotten a satisfactory result was your apprehension that you would be made a further charge of $20.00? A. I can't afford to pay $20.00 to go in and see people repeatedly.

"Mr. Shackleford: Will you read the question? (Question repeated.)

"A. Along with the fact that I couldn't stand the pain of this salve. I didn't want anymore.

let's see what the x-ray will do for them.' And he said, 'It will either do wonders or it will make it worse.'

"Q. How many treatments—excuse me. Have you finished? A. Yes.

"Q. How many x-ray treatments did you take from Dr. Jensen? A. All I had to take was one.

"Q. You only took one. That is clear in your recollection? A. Yes.

"Q. Was that a light dose of x-ray or heavy? A. He instructed his assistant there to give—I think it was three minutes.

"Q. Three minutes? A. I think so.

"Q. Now at that time, Doctor, had you arrived at your own diagnosis of cancer of the skin? A. Yes.

"Q. Did you suggest your own diagnosis to Dr. Jensen? A. No.

"Q. Did Dr. Jensen voice any opinion as to what your condition was? A. No.

"Q. Did you interrogate or inquire of him as to what his opinion was? A. No.

"Q. You didn't ask him? A. No.

"Q. You did then know, did you not, that if x-ray treatment is given for cancer of the skin that it is a large dose—what is known by radiologists as a massive dose? A. That is true.

"Q. And the dose that you received was not a massive dose, was it? A. No.

"Q. You did not return to Dr. Jensen after that one time? A. No.

"Q. You never again consulted him professionally? A. No."

9. Dr. Wilson testified that he made no charge for medical treatment, but only for the photographs, which are several enlarged colored prints.

"Q. Well, Doctor, you yourself being a professional man, were aware that no physician is a guarantor of the results. That was true, was it not? A. That was true.

"Q. And the only way any physician can accomplish a satisfactory result is to be advised by the patient of the results secured by the medications or course of treatment prescribed. A. Maybe it's my fault that I didn't keep going back, but when the hands got worse I don't think anybody would go back, would they?

"Q. You never even called him on the phone? A. No.

"Q. No communication with him? A. No.

"Q. You had a high regard for him as a dermatologist did you not? A. I had Doctor, the radiologist's recommendation.

"Q. And you had checked into his professional qualifications, had you not? A. No.

"Q. You hadn't? A. No.

"Q. Did you ever return to Dr. Wilson? A. No.

"Q. Never? A. Those pictures were taken at two different times.

"Q. Now, Doctor, isn't it a fact that in January, 1953 you did return to him? A. I returned and had pictures taken on those different dates.

"Q. So your second visit was just to get more pictures? A. Yes.

"Q. For the purpose of this lawsuit? A. No.

"Q. For what purpose were you so anxious to have pictures, Doctor? A. I was advised by the radiologist to get pictures, to help to make a diagnosis whether it was cancer or not.

"Q. Oh, you had been back then to see Dr. Jensen? A. No, I hadn't been back to see Dr. Jensen.

"Q. Was that another radiologist? A. No.

"Q. So Dr. Jensen told you, when he first sent you to Dr. Wilson, that he was sending you to him to have pictures made so that he could determine whether you had cancer? A. I can't say definitely why he recommended the pictures.

"Q. Well, now, that's the first set of pictures, isn't it? He sent you in 1951 for pictures, you have testified. That's right, isn't it? A. Yes, sir.

"Q. 1951, the first time you went? A. Yes, sir. But I didn't get the pictures for a whole year. Then when I came back I went and had more pictures taken.

*     *     *     *     *

"Q. Those photographs. He was just interested in making more pictures? A. He was the only man that I ever knew that has equipment and the ability to make a practice of taking photographs of surgical conditions.

"Q. Now, actually, Doctor, wasn't the purpose of your securing the pictures to use them in this lawsuit? A. That was '51, that those pictures were taken, wasn't it. I hadn't started any lawsuit at that time.

"Mr. Shackleford: Will you read him the question, please? (Thereupon, the reporter read the last pending question, as follows): Now, actually, Doctor, wasn't the purpose of your securing the pictures to use them in this lawsuit?

"Mr. Ramseur: I suggest you tell what date the pictures were taken.

"Mr. Shackleford: I am interrogating the witness as to the second consultation or visit which he made to Dr. Wilson, according to his testimony, in January, 1953.

"The Witness: I think it was his suggestion that he take more pictures.

"Mr. Shackleford: Now will you answer the question that I have asked you? (Addressing the re-

porter): Will you read it to him again? (Question repeated.)

"The Witness: I don't think so.

"By Mr. Shackleford: Q. And you didn't so inform Dr. Wilson? A. No.

"Q. You are positive as to that? A. I'm not positive of it, no."

This testimony is given fully because it is apparent that by appellee's testimony above, his case must fall.

■ There is nothing here to support the court's finding that "plaintiff took various treatments for the diseased condition of his hands without receiving any beneficial effect from such treatment."

■ As to the finding of fact Number 5 to the effect that "plaintiff sustained the entire irrevocable [sic] loss of the use of both hands, insofar as the conduct of his profession as a rectal surgeon was concerned," the quoted portions of the testimony by plaintiff himself negative this conclusion because a part of such a finding is the concept that the insured "availed himself of all reasonable means and remedies to remove his disability."[10] The record is eloquent of his complete failure in this regard, unless the court is to assume that the medical profession holds out no more hope for a sufferer from eczema than to shower him with hundreds of free pharmaceutical samples and tell him to use them without even attempting a diagnosis.

■ Findings Numbers 6 and 11 to the effect that from May 1, 1947 to the date of the suit plaintiff had been so incapacitated that he could not, within range of his normal ability, taking into consideration his education, training and work and his physical condition, earn wages or profits in his customary profession nor engage in any gainful occupation in a customary manner, and thus was permanently and totally disabled under the terms of the policies was without evidence to support them. This is so, first, because there can be no finding of such disability in the absence of the willingness to avail himself of means to remove his disability, as discussed above, and second, because Ellison made not the slightest move to find an occupation or employment. He did nothing to change his customary habit of spending the summers in New Hampshire and then in the fall driving to St. Petersburg for the winter. It is understandable that he would not lightly change this annual habit of twenty-five years standing, and it is also quite understandable that he might find it quite difficult to find gainful occupation that would permit him this sort of program. However, before he was entitled to ask the insurance carrier to pay him a monthly indemnity for total and permanent disability he had to make the choice and then make the effort.

As it does not appear that the plaintiff below would be able to make a different case upon a new trial, since he categorically stated he had not tried to find occupation, and since the facts as to his failure to seek professional treatment are unequivocal no advantage would result in granting a new trial. The judgment is, therefore, reversed and remanded with instructions to the trial court to enter judgment for appellant.

10. See F.N. 7.