The EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED
STATES, Appellant,

v.

Clyde H. NEILL, Appellee.

No. 16029.

United States Court of Appeals,
Fifth Circuit.

April 3, 1957.

L. S. Julian, Miami, Fla., Shutts, Bow-
en, Simmons, Prevatt & Julian, Miami,
Fla., of counsel, for appellant.

Joe Creel, Miami, Fla., for appellee.

Before TUTTLE, JONES and
BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

After paying to the assured, Dr. Neill,
monthly benefits of $100.00 under each

of two total disability policies [1] since 1932, the insurance company denied liability after September 15, 1951, on the ground that he was no longer disabled within the meaning of the contract. The insurer now appeals from judgment entered on a jury verdict in favor of Dr. Neill.

In the light of a history of admitted total disability for nearly twenty years and the inability ever to resume his practice of dentistry, the issue for trial under pre-trial order was reduced to the simple inquiry whether or not Dr. Neill, about September 1951, had recovered so that he was no longer disabled.

There was an abundance of competent, believable, medical testimony from doctors having an extensive personal and professional knowledge of Dr. Neill's condition which the jury under controlling Florida [2] principles, fully submitted in the Court's charge, could credit as showing in detail serious permanent conditions [3] rendering him physically incapable of regularly carrying on his dental profession or other work for which he was reasonably suited without jeopardy

to his health, and that these conditions had, if changed, gotten worse rather than better as he advanced in years to age 70. In view of this the real issue was not whether the medical-physical conditions were reasonably disabling in fact, but whether certain business activities since September 1951 established that he was not "disabled" under the contract definition which requires that the insured be prevented "from engaging in any occupation or performing any work for compensation of financial value."

The date of September 15, 1951, was apparently selected because about that time Dr. Neill invested $10,000 as capital as a partner with John Emile in a business manufacturing, selling and distributing automatic laundry equipment under the trade name of Speedy Washer Mfg. Co. Prior to this time and during the pendency of admitted total disability, Neill had, in 1946, 1947 and 1948, been associated with Emile as a partner in a self-service laundry, the assets of which, on dissolution, became Neill's property and which were then leased by

1. Each provided for monthly disability income payments if the insured should become "totally and presumably permanently disabled as hereinafter defined due to bodily injury or disease." The term "totally and presumably permanently disabled" was defined:

"Definition: For the purpose of this provision:

"(A) Disability is *total* when it prevents the Insured from engaging in any occupation or performing any work for compensation of financial value, and

"(B) Total Disability is *presumably permanent* only under the circumstances and from the date (herein called the Effective Date) as follows: (1) When due proof is received by the Society that it will presumably exist continuously during the remainder of the Insured's life— then from the date upon which such proof is received by the Society; or, (2) When it has existed continuously for three months—then from the date of the expiration of such three months; * * "
(Emphasis in the original)

2. New York Life Insurance Co. v. Bird, 152 Fla. 532, 12 So.2d 454; Equitable Life Assurance Society of the United

States v. McKeithan, 119 Fla. 486, 160 So. 883; New York Life Insurance Co. v. Lecks, 122 Fla. 127, 165 So. 50; New England Mut. Life Ins. Co. v. Huckins, 127 Fla. 540, 173 So. 696; Equitable Life Assurance Society of the United States v. Wiggins, 115 Fla. 136, 155 So. 327; Mutual Life Insurance Co. of New York v. Ellison, 5 Cir., 223 F.2d 686, certiorari denied 350 U.S. 845, 76 S.Ct. 86, 100 L.Ed. 752.

3. These included: severe arthritis with limitations of motion in his right knee, right wrist and entire spine, infection and clotting of veins of legs causing recurrent, slow healing ulcers, diminished blood supply to lower extremities, diabetes, diseased gall bladder, double hernias twice but unsuccessfully repaired by surgery, removal of nervicular bone of the right hand, extreme nervousness, constant pain often ranging from severe to unbearable in intensity, phlebitis with production of emboli, blood clots, with danger of occlusions in heart, lungs or extremities, inability to stand, sit, or remain in constant position for prolonged periods, etc.

him to Emile as lessee with an option to Emile to purchase the personal property for $32,000. Speedy Washer Mfg. Co. operated as a partnership until about July 1953 when it became a Florida corporation with Emile as president and Neill as secretary treasurer. Shortly thereafter Neill sold his stock in the corporation receiving $25,000 in cash and preferred stock valued by him at approximately $20,000.

During this two-year period (September 1951-October 1953), Dr. Neill did not draw any salary or allowance as an employee, had no specific duties to perform and received no compensation. He did, however, come to the office frequently when he felt like it, during which time he might do odd jobs or chores, answer the telephone, relay information, talk to representatives of suppliers about procurement of or payment for materials desired by the plant superintendent or Emile in the manufacturing operations, occasionally type and sign a letter to a customer, creditor or supplier, sign or type or approve a few purchase orders, take deposits to the bank, and the like. And, as a partner expressly designated in the resolutions furnished to depository banks as a person authorized to sign checks on the firm's bank accounts, he signed approximately four thousand checks. On about eight occasions, as one of the partners of a business seeking credit, he conferred with bank officials in connection with loans made for operating capital.

There is no evidence compelling a conclusion that Dr. Neill either was regularly on the job or that he was physically capable of it. Indeed, many of the checks were signed by him at his home while in bed from his infirmities, and in three efforts to make special trips to distant places on matters of importance to the financing of the enterprise, he completed only one with two terminated en route because of physical weakness and overpowering pain.

The sum of the evidence was quite sufficient to permit the jury to conclude that this man of advancing years, seeking an outlet by some constructive activities which the developing field of geriatrics suggests is so important to older people as they discover some of the illusions of retirement, came around the office to reflect a continuing interest in the welfare and progress of an enterprise in which he had invested substantial savings and to engage, as he felt or desired, in small little tasks and odd jobs to while away the time. The fact that these occasional errands and clerical actions might have had some slight value to the company as a savings in payroll (there is no evidence of any such savings), or that his stock ownership in the business was ultimately sold for a substantial gain does not compel a conclusion that what he was doing amounted to engaging in an occupation or performing work for compensation of financial value.

The oft-repeated Florida statement that under a policy definition that total and permanent disability exists when the insured is prevented from performing any work, it "does not mean that [the] insured must be bedridden or reduce to [a] condition of complete helplessness," New York Life Insurance Co. v. Bird, supra, is pertinent here. To it we may add that the insured under such conditions is not required to remain completely idle confining his activities either to his home or the recreational pursuits of elderly retired persons. He had a right, if he wishes, to make investments and this would include investments in stocks or new budding enterprises. He does not cease being an investor and become an operator merely because he displays a close interest in watching and following his investment. Nor, so long as, without impairment of his health, he is physically incapable within the range of his normal abilities to engage in reasonably regular, continuous work for wages or profit in his customary occupation or some other gainful employment for which he is reasonably suited, New York Life Insurance Co. v. Bird, supra, does the performance without pay of occasional tasks not

a regularly assigned responsibility amount, as a matter of law, to "engaging in any occupation or performing any work for compensation of financial value."

The insurer's motion for directed verdict was therefore properly refused.

 We find no merit in the other complaints relating to developments on the trial. Assuming, despite considerable doubt, that adequate objection, Fed. Rules Civ.Proc. rule 51, 28 U.S.C.A., was taken to an isolated portion of the charge,[4] we find in it no basis for reversal, F.R.C.P. 61. Bound, as we are, by Florida law, the trial court was entirely justified in submitting the charge in almost the very words of Equitable Life Assurance Society of the United States . v. McKeithan, supra, repeated, with approval, New York Life Insurance Co. v. Lecks, supra. And, equally important, this was but a slight portion of extended instructions, nowhere challenged, in terms of the principles of the Florida law, note 2, supra. Perhaps prophetically the judge, on the eve of the jury's retirement cautioned the jury to consider the whole charge, and in such setting the jury could not have gained the impression that "if he so wishes" left the whole lawsuit up to Dr. Neill's fancy.

 The objection, resting primarily on Hamilton v. United States, 5 Cir., 73 F.2d 357, 358, to the admission of the opinion of two doctors that Neill was totally disabled likewise fails. For it disregards the fact that we there thought that the doctors' opinion was the dual one that the patient was physically incapable of work and that what he could do was not gainful employment. The latter phrase, we held, was for the jury, not the doctors. Here, the issue was Dr. Neill's physical capacity to carry on particular activities, a thing which, with the history of his extensive ail-

ments, properly permitted the assistance of competent medical opinion. The questions and answers complained of here refer, we think, to matters within the special competence of medical experts. And, in any case, the particular questions and answers were cumulative of similar testimony from at least one of these two doctors and from others, but to which no objection had been made. It could not possibly have had a harmful effect, F.R.C.P. 61.

Affirmed.

---

4. "Total disability means inability on the part of the insured to do substantially all of the material acts necessary to the insured's engaging in any occupation for remuneration or profit, taking into consideration his mental and physical capacity so to do if he so wished."