233 F.2d 796
 Charles BROWN, a minor, by his father and next friend,
Walter Brown, Jr., et al., Appellants,
v.
Dr. Edwin L. RIPPY, as President of the Board of Trustees of
the Dallas Independent School District, Dallas
County, Texas, et al., Appellees.
 No. 15872.
 United States Court of Appeals Fifth Circuit.
 May 25, 1956.
Rehearing Denied June 19, 1956.
 
 U. Simpson Tate, W. J. Durham, J. L. Turner, Jr., Louis A. Bedford, Jr., Dallas, Tex., Thurgood Marshall, New York City, C. B. Bunkley, Jr., Dallas, Tex., Kenneth Holbert, Dallas, Tex., Robert L. Carter, New York City, Jack Greenberg, New York City, of counsel, for appellants.
 A. J. Thuss, Jr., Dallas, Tex., for appellees.
 Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.
 PER CURIAM.
 
 
 1
 The suit was brought by Negro children of school age against the President and members of the Board of Trustees of the Dallas Independent School District and others for a declaratory judgment and an injunction. It had for its object the entry of a judgment requiring the defendants to desegregate with all deliberate speed the schools under their jurisdiction, and to cease their practices of segregating plaintiffs in elementary and high school education on account of race and color.
 
 
 2
 The claim was that the defendants, though obligated to do so, were conspiring to neglect to proceed as required by law.
 
 
 3
 The defendants denied that they were proceeding or proposing and conspiring to proceed, in violation of law, to force segregation upon plaintiffs on account of their race and color. Alleging in effect that they were proceeding, and would continue, as required in and by the decisions of the Supreme Court, to proceed with all deliberate speed with the change over from segregated to non-segregated schools, they prayed that all relief, declaratory and injunctive, be denied.
 
 
 4
 When the case was called, instead of a hearing on evidence or agreed facts, there was a running colloquy between judge and counsel, in which, after admitting that at least some of the plaintiffs had sought and been denied admission on a non-segregated basis, the defendants' counsel vainly tried to offer, in explanation and support of their action, evidence of the matters pleaded by them.
 
 
 5
 Declining to hear the evidence, apparently under the mistaken view that the plaintiffs had agreed to the facts pleaded by defendants, though the record showed the exact contrary, the district judge, determining that the suit was premature, denied the injunction prayed and ordered the suit dismissed without prejudice to the right of plaintiffs to file it at some later date.
 
 
 6
 Appealing from that order plaintiffs are here insisting that the record shows that the judgment was entered under a complete misapprehension both of the law and of the facts and must be reversed.
 
 
 7
 The defendants here urging that the action of the court responded to the facts as shown of record and to the law as declared in the decisions of the Supreme Court, insist that the suit was premature and was properly dismissed without prejudice.
 
 
 8
 We think it quite clear that there is no basis in the evidence for the action taken by the district judge, none in law for the reasons given by him in support of his action. The judgment is accordingly vacated and reversed and the cause is remanded with directions to afford the parties a full hearing on the issues tendered in their pleadings.
 
 
 9
 CAMERON, Circuit Judge (dissenting).
 
 I.
 
 10
 The Court below stated, as one of its reasons for dismissing the complaint without prejudice, the following:[1]
 
 
 11
 'The direction from the Supreme Court of the United States requires that the officers and principals of each institution, and the lower Courts, shall do away with segregation after having worked out a proper plan. That direction does not mean that a long time shall expire before that plan is agreed upon. It may be that the plan contemplates action by the state legislature. It is not for this Court to say, other than what has been said by the Supreme Court in that decision.
 
 
 12
 'To grant an injunction in this case would be to ignore the equities that present themselves for recognition and to determine what the Supreme Court itself decided not to determine. Therefore, I think it appropriate that this case be dismissed without prejudice to refile it at some later date. Give them some time to see what they can work out, and then we will pass upon that equity.'
 
 
 13
 The Court below was evidently referring to what the Supreme Court said in its two segregation decisions: 'Because these are class actions, because of the wide applicability of this decision, and because of the great variety of local conditions, the formulation of decrees in these cases presents problems of considerable complexity. * * *'[2]
 
 
 14
 'Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. * * * At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. * * * To that end, the courts may consider problems relating to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. * * *'[3]
 
 
 15
 In my opinion, the Court below was justified in using its discretion to dismiss this action without prejudice on the ground that it was prematurely brought. It seems clear that the course of action fixed by the Supreme Court contemplated that school boards and other state officials should take hold of the complex problem and work it out with the aid and in the light of their superior knowledge of the problem in all of its ramifications. These state officials were to work in an administrative capacity under the plans detailed in these two opinions. The Supreme Court recognized that the problem should be viewed as a whole and that time would be required and that the state authorities should be given full primary responsibility, as well as authority, to solve the problem in the light of local conditions. As long as these officials were proceeding in good faith and with deliberate speed to do this, it is clear to me that the Supreme Court did not intend that they should be subjected to harassment by vexatious suits or by the intervention of the courts. It was the 'action of the school authorities' which courts were to pass upon at the proper time and after there had been opportunity for such action. The scheme did not contemplate that the courts should anticipate or seek to control such action or should impede it by too close chaperonage. 'Action' is defined as 'an act or thing done',-- i.e. already performed.
 
 
 16
 The principles controlling in such a situation were announced in a recent decision of the Supreme Court in a situation not unlike that with which we are here dealing.[4]
 
 
 17
 That case involved the question whether judicial action would be taken to arrest the functioning of the First and Second Renegotiation Acts on constitutional grounds before administrative remedies had been exhausted. The Supreme Court held that such a short-circuiting of the administrative remedy would be 'a long overreaching of equity's strong arm', and used this language in reaching that conclusion:
 
 
 18
 'The doctrine, (exhaustion of administrative remedy) wherever applicable, does not require merely the initiation of prescribed administrative procedures. It is one of exhausting them, that is, of pursuing them to their appropriate conclusion and, correlatively, of awaiting their final outcome before seeking judicial intervention. The very purpose of providing either an exclusive or an initial and preliminary administrative determination is to secure the administrative judgment either, in the one case, in substitution for judicial decision or, in the other, as foundation for or perchance to make unnecessary later judicial proceedings. Where Congress (here the Supreme Court) has clearly commanded that administrative judgment be taken initially or exclusively, the courts have no lawful function to anticipate the administrative decision with their own, whether or not when it has been rendered they may intervene * * *. To do this not only would contravene the will of Congress as a matter of restricting or deferring judicial action. It would nullify the congressional objects in providing the administrative determination.'
 
 
 19
 Again, in Myers v. Bethlehem Shipbuilding Corp.,[5] Mr. Justice Brandeis, citing a score of cases, stated: 'The contention is at war with the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. * * * Obviously, the rule requiring exhaustion of the administrative remedy cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage. Lawsuits also often prove to have been groundless; but no way has been discovered of relieving the defendant from the necessity of a trial to establish the fact.'[6]
 
 
 20
 And this Court has applied the principle in a series of cases involving claims under the Fourteenth Amendment. The first of these was Cook v. Davis, 5 Cir., 1949, 178 F.2d 595, 600, certiorari denied 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596. A District Court in Georgia had intervened by injunction in favor of Davis, who claimed that he was discriminated against as a Negro teacher. This Court wrote an exhaustive opinion in reversing that decision and used this language:
 
 
 21
 'The broad principle that administrative remedies ought to be exhausted before applying to a court for extraordinary relief, and especially where the federal power impinges on State activities under our federal system, applies to this case. 'No one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.' Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, at page 50, 58 S.Ct. 459, at page 463, 82 L.Ed. 638, citing many cases relating to relief by injunction. We held in Bradley Lumber Co. (of Arkansas) v. National Labor Relations Board, 5 Cir., 84 F.2d 97, that the same principle applies to relief by declaratory decree. 'The rule that a suitor must exhaust his administrative remedies before seeking the extraordinary relief of a court of equity (citing many cases), is of special force when resort is had to the federal courts to restrain the action of state officers.' * * *'[7]
 
 II.
 
 22
 The situation before the Court below furnishes an excellent illustration of the wisdom and relative necessity of permitting the school authorities to apply their experience, judgment and investigative facilities to the solution of the problem. Dallas County has one hundred twenty school buildings, housing for instruction 78,691 white children and 14,593 Negro children. Each of those schools and each of the children presents a separate problem to be dealt with in the light of many other considerations besides race. It is not humanly possible that the District Courts consider and resolve those problems in all of their details and intricacies.
 
 
 23
 The Northern District, in which Dallas County is situated, has ninety-nine other counties whose legal business must be handled by three active District Judges. If the Court below is to be compelled to take jurisdiction of this action and try it, there is no reason why every other school child in Dallas County and in the Northern District of Texas, both white and Negro, should not file suit and demand a hearing and procure an adjudication of his own individual problems.
 
 III.
 
 24
 Under accepted equitable principles a court should accept and exercise jurisdiction only when it is made clearly to appear from the pleadings that the school officials are not performing their administrative functions in good faith. The complaint here fails entirely to charge any facts tending to sustain such a thesis and the answer refutes it completely. The Court will presume that the state officials are acting honestly and that they will expeditiously give plaintiffs all relief to which they are entitled. Davis v. Arn, 5 Cir., 1952, 199 F.2d 424.
 
 
 25
 The complaint alleges that the twenty-seven plaintiffs on September 5, 1955 applied for admission to certain schools in Dallas Independent School District: one applied to a junior high school; eight applied to a high school; and the residue applied to four separate elementary schools. In each instance it is alleged that the principal of the school conspired with the superintendent of public schools to deprive plaintiffs of the right immediately to attend the specified schools based upon their race and color.
 
 
 26
 The complaint contains no charge at all that the school officials did not act in good faith in denying them such immediate entry or that the facts did not justify such denial. The complaint prayed for a declaratory judgment declaring the statutes of the State of Texas under which defendants assumed to act unconstitutional, and defining the legal rights and relations of the parties; and for injunction, both temporary and permanent against any enforcement by the defendants of the Texas Statutes referred to. The answer contains this statement:
 
 
 27
 '* * * Defendants deny there is any scheme or conspiracy to circumvent or evade the law or to deprive any child, student or other person of their civil rights. The principals of the various schools were following the instructions issued to them by the administrative staff. The administrative staff and the district trustees are now and have been making an honest, bona fide, realistic study of the facts to meet the obligations the law has placed upon them to provide adequate public school education and to perfect, as soon as possible, a workable integrated system of public education.'
 
 
 28
 It was further shown from the sworn answer and the stipulations of counsel that the Dallas Public School System has operated for ninety years as a segregated system and that budget procedures looking to the raising of funds by taxation had been formulated and bonds issued on that basis and upon the enumeration of white and Negro students already made. The details of the budget are controlled by state laws and practices, and thereunder statistical data is gathered in January of each year. The budget for the school year had reached an advanced state of preparation when the Supreme Court decision was published on the last day of May, 1955, and it was impossible to make the necessary adjustments and allocations of students and teachers by the beginning of the school year in September, 1955.
 
 
 29
 In order that all might be advised of this, the superintendent of schools issued a statement on July 13, 1955, advising that a detailed study of all of the problems inherent in desegregating was in progress and the details of that study were set forth. Thirty-five million dollars in bonds had recently been issued and the capital improvements involved therein would have to be changed. Sixty percent of the money for operating the Dallas schools came from the State of Texas, and the Attorney General had ruled that funds could be allocated for the coming year only on the segregated basis existing when appropriations were made and plans for the school year set in motion. Complete chaos and a complete breakdown in public school education for both white and Negro students would result if the school officials should undertake a haphazard effort to deal specially with isolated individuals and the six schools involved in the suit out of the total of one hundred twenty. The situation required an over-all adjustment based upon a consideration of the entire school system, and granting to all individuals and classes the rights spelled out in the Supreme Court decisions.
 
 IV.
 
 30
 These facts were known to the plaintiffs and their attorneys when they applied for admission to the six schools mentioned, and when, one week thereafter, this civil action was begun. Anyone willing to accept facts would know that the relief demanded in the suit could not be afforded in so short a time. That relief was threefold. (1) A judgment was sought declaring the Texas Statutes unconstitutional. These statutes have been declared unconstitutional by the Supreme Court of Texas and defendants' do not take issue with the averments of the complaint in this regard and nothing is presented for the Court to decide. (2) Plaintiffs prayed that the rights of the parties by declared. There was no controversy between the litigants as to their respective rights. Plaintiffs claimed the right to be admitted to schools without discrimination because of race or color. The defendants freely admitted that right. The only point at issue related to timing. There was no 'actual controversy' between the parties, and, therefore, no jurisdiction was conferred on the Court by 28 U.S.C.A. § 2201 and Rule 57 F.R.C.P., 28 U.S.C.A. (3) Injunctions, preliminary and permanent were sought. There was no threat by the defendants to do anything plaintiffs did not want done or to omit doing anything plaintiffs wanted done. Defendants solemnly declared their readiness to admit plaintiffs to schools on an integrated basis when the problem could properly be worked out. The very basis of injunctive relief is threatened action or failure to act by one party in derogation of established rights of the other party. The rights claimed by the plaintiff are admitted and neither the pleadings nor the proof reflect any threat by the defendants to violate those rights. Therefore, there is no basis for injunctive relief.
 
 
 31
 'The history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction. There have been as many and as variegated applications of this supple principle as the situations that have brought it into play. * * * Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to the enforcement of the criminal law * * * or the final authority of a state court to interpret doubtful regulatory laws of the state * * *. These cases reflect a doctrine of absention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary. * * * This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers. * * *'[8]
 
 V.
 
 32
 The majority opinion reverses the judgment dismissing the complaint without prejudice and orders the Court below to 'afford the parties a full hearing on the issues tendered in their pleadings.'[9] To permit judicial proceedings to be in progress while the school authorities are seeking to perform duties defined by the Supreme Court as primary is not only to provide duplication of effort and to bring the two proceedings into inevitable conflict, but it is to cast into confusion a scheme which the Supreme Court spelled out with clarity. Particularly is this true where, as here, it is perfectly plain that the school authorities have not had time to study the complexities of the problem and to come up with the proper answers.
 
 
 33
 It is not reasonable that the Supreme Court would have placed primary responsibility in a group commissioned to act administratively with the expectation that this group would be hampered or vexed in accomplishing their task, severely difficult at best, by contemporaneous litigation directed towards fashioning a club to be held over their heads. Such a judicial intervention would connote a distrust of the functioning of the preliminary administrative process and would cast those conducting it under a handicap of suspicion so great as to thwart at the threshold the orderly carrying out of the procedures so plainly delineated by the Supreme Court.
 
 
 34
 Moreover, that course would, in my opinion, contravene the principles and policies so carefully worked out by this Court in Cook v. Davis, supra, and the other cases following it; and would repudiate the approval we gave to the action of the trial court in Davis v. Arn, supra, where the complaint had been dismissed as premature, and the language we there used, 199 F.2d at page 425:
 
 
 35
 'We cannot assume that if plaintiffs had pursued that remedy that would have been denied the relief to which they were entitled. The presumption is the other way. As the complaint does not allege that plaintiffs have availed themselves of the state administrative remedies open to them under the Act, their resort to a federal court to control state officers in the performance of their duties is premature.'
 
 
 36
 It is my opinion that it was within the competence of the Court below to dismiss without prejudice this prematurely brought complaint and that, in doing so, it followed the spirit and letter of the Supreme Court's opinions and also vindicated the true function of the judicial process. I would affirm.
 
 
 37
 Rehearing denied: CAMERON, Circuit Judge, dissenting.
 
 
 
 [1]
 It mentioned other grounds arguendo but this is the basic finding
 
 
 [2]
 Brown v. Board of Education, etc., May 17, 1954, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873
 
 
 [3]
 Brown v. Board of Education, etc., May 31, 1955, 349 U.S. 294, 299-301, 75 S.Ct. 753, 756, 99 L.Ed. 1083
 
 
 [4]
 Aircraft and Diesel Equipment Corp. v. Hirsch, 1947, 331 U.S. 752, 767, 67 S.Ct. 1493, 1500, 91 L.Ed. 1796
 
 
 [5]
 1938, 303 U.S. 41, 50-51, 58 S.Ct. 459, 463, 82 L.Ed. 638
 
 
 [6]
 And see also Alabama Public Service Commission v. Southern Railway Co., 1951, 341 U.S. 341, 349, 350, 71 S.Ct. 762, 95 L.Ed. 1002
 
 
 [7]
 And see Bates v. Batte, 5 Cir., 1951, 187 F.2d 142, 144. And we applied the rule as 'of special importance between the federal courts and state functionaries' when we denied equitable relief to Negroes seeking voting rights in Peay v. Cox, 5 Cir., 1951, 190 F.2d 123, 125, certiorari denied 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 671
 
 
 [8]
 Railroad Commission of Texas v. Pullman Co., 1941, 312 U.S. 496, 500-501, 61 S.Ct. 643, 645, 85 L.Ed. 971, and see also Burford v. Sun Oil Co., 319 U.S. 315, 332-333, 63 S.Ct. 1098, 87 L.Ed. 1424; Reliable Transfer Co. v. Blanchard, 5 Cir., 1944, 145 F.2d 551, 552
 
 
 [9]
 Plaintiffs aver in their complaint that they are entitled to have it heard by a three-judge court under 28 U.S.C.A. § 2281, et seq., and pray that such a court be convened. If the hearing ordered by the majority is to be held, it is my opinion that these statutes must be followed, and that any injunction which might possibly be ordered by one judge would be void for want of jurisdiction. The statute provides: 'An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under Section 2284 of this title.' The complaint specifically avers that the defendants are so acting under state statutes and the language of 2281 fits the situation exactly. Although such practices are much in vogue, I do not share the belief that specific congressional provisions can be repealed or circumvented by judicial fiat
 See Board of Supervisors, etc. v. Tureaud, 5 Cir., Oct., 1955, 226 F.2d 714, and my dissents in the same case reported in 225 F.2d 434, at page 435, Aug. 23, 1955, and 228 F.2d 895, at page 896, Jan., 1956.