Alfred AVERY, Jr., A Minor, by his Mother and Next Friend, (Mrs.) Alfred Avery, et al., Appellants,

v.

WICHITA FALLS INDEPENDENT SCHOOL DISTRICT, et al., Appellees.

No. 16148.

United States Court of Appeals Fifth Circuit.

Jan. 9, 1957.

Dissenting Opinion Jan. 25, 1957.

Cameron, Circuit Judge, dissented.

U. Simpson Tate, Louis A. Bedford, Jr., Dallas, Tex., Robert L. Carter, Thurgood Marshall, New York City, for appellants.

R. Marvin Pierce, Clyde Fillmore, Wichita Falls, Tex., for appellees.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

RIVES, Circuit Judge.

This action was brought by twenty negro children of public school age, residents of the Wichita Falls Independent School District, as a class action, the complaint averring,

"4. Minor plaintiffs bring this action by their next friends in their own behalf, and on behalf of all other Negro minors who are similarly situated because of race or color within the defendant Wichita Falls Independent School District. They allege that they are members of a general class of persons who are segregated and discriminated against by order of the defendant board of trustees of the defendant Wichita Falls Independent School District because of their race and color; that the members of the class are so numerous as to make it impracticable to bring all of them before this Court; that they, as members of the class, can and will fairly represent all of the members of the class; that the character of the right sought to be enforced and protected for the class is several and that there is a common question of fact and law affecting the several rights of all and a common relief is sought, and that they bring this action by their next friends as a class action pursuant to Rule 23(a) (3), of the Federal Rules of Civil Procedure. [28 U.S.C.A.]"

The prayer was for a declaratory judgment as to the rights and privileges of the class, and that the defendants be enjoined from denying to the minor plaintiffs and the members of the class of persons they represent the right and privilege of attending the public elementary school nearest their respective homes "under the same conditions and circumstances and without any distinctions being made as to them on the basis of their race or color."

The defendants moved to dismiss the complaint and in the alternative for a summary judgment, and the court dismissed the complaint stating in its order of dismissal that:

"taking into consideration all of the proof, the declared purpose and policy of the defendants to carry out desegregation in the schools of the District during the next school term, the progress already made and the defin-

ite prospect that such voluntary adjustment will be accomplished within a matter of months, it appears to the Court that judicial intervention under the equity powers at this time would be premature or inadvisable, and the Court is also of the opinion that the specific grievance alleged by the plaintiffs from being denied entrance at the Barwise School, has now become moot."

The negro population in the Wichita Falls Independent School District lived largely in one single concentrated area. At the time the action was filed, some fourteen to sixteen negro children along with 680 white children attended the Sheppard Air Force Base Elementary School which was operated on a non-segregated basis,[1] and nearly all other negro pupils in the Wichita District, slightly over a thousand, attended the Booker T. Washington School, a school operated for negroes only. The answer admitted that,

"Present statistics indicate that there are approximately 140 colored students who should be admitted to Barwise school if the district comprises a compact unit situated within its natural access boundaries."

In addition there were still other negro children of school age, about seventeen in number, residing within the areas served by various other schools in the Wichita District, but who were "automatically" transferred to the Booker T. Washington School. Altogether more than 13,000 pupils were enrolled in the schools of the Wichita Falls Independent School District. No negro child was going to any school other than the Booker T. Washington School and Sheppard Air Force Base School.

The plaintiffs lived in the area served by the Barwise School. At the opening of the school term in September, 1955, they applied for admission to that school and it is admitted that they were refused on racial grounds. The Barwise School was then being attended by white children only, but a new school was under construction in Sunnyside Heights, a white section of the town, to which it was planned to transfer the white pupils. The new school had been scheduled for completion by September, 1955 but was not actually completed until January, 1956, after the present suit had been filed. The white pupils were then transferred from Barwise to the new school; Barwise was renamed the A. E. Holland School after a former negro principal of the Booker T. Washington School, and was opened on a nominally desegregated basis though only negro pupils, including the minor plaintiffs, registered.

The Superintendent of Schools testified that a start had been made toward desegregating the schools because the Sheppard Air Force Base School had been desegregated and was attended by white children and by some fourteen to sixteen negro children, and because the A. E. Holland School was legally desegregated though actually attended by negro children only, and, further, that it was the intention of the Board to completely desegregate the entire district "at the earliest feasible moment", that "by the beginning in September of this, of 1956, we will have a very good beginning; and by midterm of 1957 it's altogether possible that the entire school system could be desegregated."

Clearly plaintiffs seeking judicial relief from racial discrimination applied against the members of a numerous class may maintain a class action.[2]

---

1. It had been desegregated at the request of the United States Department of Health, Education and Welfare.

2. Rule 23, F.R.C.P.; The School Segregation Cases, Brown v. Board of Ed. of Topeka, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873; Beal v. Holcombe, 5 Cir.,

193 F.2d 384; Frasier v. Board of Trustees of University of North Carolina, D. C.M.D.N.C., 134 F.Supp. 589, 593, affirmed per curiam 350 U.S. 979, 76 S.Ct. 467; Holmes v. City of Atlanta, D.C.N.D.Ga., 124 F.Supp. 290, 293, affirmed 5 Cir., 223 F.2d 93, modified and remanded 350 U.S. 879, 76 S.Ct. 141; Kansas City, Mo.

At the time the district court dismissed the complaint, a part of the plaintiffs' prayer had been met, that is they were attending the public school nearest their homes, but it is by no means certain that they had the same free privilege of transfer to or attendance on any school of their choice as was accorded the white children. Admittedly desegregation of the schools of the district had not then been completed, though the defendants professed such a purpose, and the court thought that it would be accomplished "within a matter of months".

Upon this appeal, the appellees have attached as an exhibit to their brief an affidavit of the Superintendent of Schools to the effect that the 1956 summer session of the Wichita Falls Senior High School was non-segregated and was actually attended by 411 white and 15 negro children; that, on September 5, 1956, all pupils were admitted to the schools to which they applied for admission without any discrimination because of their color, though no negro children applied for admission to any school except Sheppard Air Force Base School, Booker T. Washington School and A. E. Holland School. The appellees urge upon us that, if not moot at the time the district court dismissed the complaint, the cause has now become moot and that the appeal should be dismissed or that the judgment of the district court should be affirmed.

The appellants, on their part, deny that the public schools within the Wichita Falls Independent School District have actually and in good faith been desegregated, and insist that, it being undisputed that when the complaint was filed the defendants had denied to the plaintiffs solely on account of their race the right to attend the school of their choice, a

claimed cessation of such unlawful conduct would not render the action moot nor justify its dismissal.[3]

■ The Constitution as construed in the School Segregation Cases, Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873; Id., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, and Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, forbids any state action requiring segregation of children in public schools solely on account of race; it does not, however, require actual integration of the races. As was well said in Briggs v. Elliott, D.C.E.D.S.C., 132 F.Supp. 776, 777:

"* * * it is important that we point out exactly what the Supreme Court has decided and what it has not decided in this case. It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. This, under the decision of the Supreme Court, the state may not do directly or indirectly; but if the schools which it maintains are open to children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools, as they attend different churches. Nothing in the Constitution or in the decision of the Supreme Court

v. Williams, 8 Cir., 205 F.2d 47, 51, 52; Wilson v. Board of Supervisors, E.D.La., 92 F.Supp. 986, affirmed per curiam, 340 U.S. 909, 71 S.Ct. 294, 95 L.Ed. 657.

3. For this position, the appellants cite and rely on the following cases: United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; United States v. U. S. Steel Corp.,

251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343; Federal Trade Comm. v. Goodyear Tire & Rubber Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326; Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L. Ed. 29; United States v. Oregon Med. State Soc., 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978; United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303.

takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation. The Fourteenth Amendment is a limitation upon the exercise of power by the state or state agencies, not a limitation upon the freedom of individuals."

■ Keeping that principle in mind, we cannot say that the district court abused its discretion in declining to enter a decree declaring the rights of the parties or enjoining against discrimination. The primary responsibility rested upon the Board, and the district court had the discretion to withhold action when convinced that the Board had made "a prompt and reasonable start" and was proceeding to a "good faith compliance at the earliest practicable date."[4] Such start and continuation were steps, but no more than steps, toward compliance, and, until that goal was reached, the plaintiffs and the class represented by them would be denied their constitutional right to be free from state imposed discrimination because of their race or color. In the Brown Case, supra, it appeared that,

> "The presentations * * * demonstrated that substantial steps to eliminate racial discrimination in public schools have already been taken, not only in some of the communities in which these cases arose, but in some of the states appearing as *amici curiae*, and in other states as well. Substantial progress has been made in the District of Columbia and in the communities in Kansas and Delaware involved in this litigation." 349 U.S. at page 299, 75 S.Ct. at page 755.

The Court nevertheless directed that, "During this period of transition, the courts will retain jurisdiction of these cases." 349 U.S. at page 301, 75 S.Ct. at page 756. See also, Brown v. Rippy, 5 Cir., 233 F.2d 796.

■ We are of the clear opinion that, at the time of the rendition of judgment by the district court the case had not become moot and that it was error to dismiss the action.

The cases relied on by appellants establish the proposition that voluntary cessation of illegal conduct does not make the case moot. If, however, in addition the court finds that there is no reasonable probability of a return to the illegal conduct, and that no disputed question of law or fact remains to be determined, that no controversy remains to be settled, then it should not adjudicate a cause which no longer exists. United States v. W. T. Grant Co., supra, 345 U.S. at page 633, 73 S.Ct. 894, 97 L.Ed. 1303; Brownlow v. Schwartz, 261 U.S. 216, 43 S.Ct. 263, 67 L.Ed. 620. It cannot be claimed that the appeal has become moot through compliance with a proper decree. Instead, the claim is that the entire case has become moot through cessation of the unlawful conduct. Ordinarily, such a claim should be considered by the trial court in the first instance. It is said, however, that in so far as the law is concerned no question is now presented which has not already been settled by the School Segregation Cases, supra, and that is true. The facts, on the other hand, may be subject to more than one interpretation. The appellants question whether the actual segregation existing in most of the schools is, in fact, voluntary. Events which have occurred since the judgment of dismissal, or which may occur in the future may constitute "good faith compliance", but, in the present circumstances, that question should not be determined by this Court on the basis of ex parte affidavits; such an issue depending largely on the good faith of the defendants can be better decided by the district court after a full and fair hearing. "Because of their proximity to local conditions and the possible need for fur-

4. Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 756.

ther hearings, the courts which originally heard these cases can best perform this judicial appraisal." Brown v. Board of Education, supra, 349 U.S. at page 299, 75 S.Ct. at page 756. The district court should retain jurisdiction for the entry of all judgments and orders necessary to ascertain, or else to require, "good faith compliance."

The judgment is, therefore, reversed and the cause remanded.

Reversed and remanded.

CAMERON, Circuit Judge, dissents.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

CAMERON, Circuit Judge (dissenting).

I concur in much which is said in the majority opinion and think its reasoning ought to lead to an affirmance of the act of the Court below in dismissing the complaint following its decision on the merits by summary judgment. But I cannot go along in the majority's action in remanding the case with instructions that it remain on the docket. The inevitable result of such a course is to thrust back into the field of controversy a problem which can, in my opinion, move towards real solution only in an atmosphere of repose and harmony. I am constrained to set down some of the reasons for my dissent because they are based upon fundamental disagreement with the thinking of my colleagues as to the mission and true competence, in segregation cases, of federal courts generally and of this Court in particular.

Historical principles of equity combine with recent Supreme Court decisions to establish these basic tenets: (a) that school boards and local officials, as administrative agencies, should be given full primary responsibility and authority with the unfettered and unembarrassed opportunity to work out problems in the light of local conditions; (b) that federal district courts should intervene only after the exhaustion of the administrative remedy; and should grant injunctions only in those cases where it is demonstrated that the general good of the public, including the litigants, will be served; and (c) that this Court should set aside judgment based upon the superior knowledge by district judges of local conditions only in rare instances where it is clear that they have misconceived or misapplied the law or have been guilty of plain abuse of discretion. This decision, and others like it recently rendered by this Court do not, in my judgment apply these fundamental and definitely established principles.

I.

(a) It cannot, in my judgment, be doubted that the main hope of solving the difficult problems before us rests with local school boards. The Supreme Court recognized this [1] and gave expression to this postulate in the second Brown decision: "Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for *elucidating, assessing,* and *solving* these problems * * *." [Emphasis added.]

It is our duty, under authorities which will be discussed, to assume that school boards are constituted of men of wisdom, judgment and dedication; and to view their actions in a spirit of trust and tolerance, not tinctured with suspicion. Dean Griswold, of the Harvard Law School has said: [2] "The courts do not have the sole responsibility for the proper conduct of our government". And Mr. Justice Stone expressed the same idea: [3] "Courts are not the only agency

1. The Segregation Cases, as normally referred to by the Supreme Court, are Brown v. Board of Education of Topeka, May 17, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (known as first decision) ; and same case, May 31, 1955, 349

U.S. 294, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (known as second decision).

2. The Fifth Amendment Today, p. 40.

3. United States v. Butler, 297 U.S. 1, at page 87, 56 S.Ct. 312, at page 329, 102 A.L.R. 914.

of government that must be assumed to have capacity to govern." So much of the business of the country is conducted by administrative bodies that courts commit, in my opinion, egregious error when they do not credit their actions as the product of an equal co-ordinate branch of government equally devoted to the public service. The Supreme Court has said of the relationship between the courts and administrative bodies [4] that "neither can rightly be regarded by the other as an alien intruder, to be tolerated if must be, but never to be encouraged or aided by the other in the attainment of the common aim."

(b) The findings of administrative bodies have uniformly been held by the courts in great respect and considered presumptively correct.[5] This Court has heretofore been disposed to adhere strictly to the proposition that school and similar boards should be invested with full and unshackled power to act and that courts should not intervene until exhaustion of their administrative functions.[6]

(c) In dealing with administrative action by State Officers it is helpful to keep in view constantly the much-quoted language of the Supreme Court in Railroad Commission of Texas v. Pullman Co., 1941, 312 U.S. 496, 500–501, 61 S.Ct. 643, 645, 85 L.Ed. 971:

"The history of equity jurisdiction is the history of *regard for public consequences in employing the extraordinary remedy of the injunction. * * ** Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless fric-

tion with state policies * * *. These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary." [Emphasis added.]

**II.**

It is important, also, to refresh our minds as to the duty here imposed upon United States District Courts and the character and ingredients of their discretion.

(a) There can be no doubt that the Supreme Court recognized that the responsibility for legal action in these cases should be vested in the judges of the District Courts who had intimate knowledge of local conditions. " * * * because of the great variety of local conditions, the formulation of decrees in these cases presents problems of considerable complexity." [7] In the second Brown opinion the Court said: "Because of their *proximity to local conditions* and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal * * *." [Emphasis supplied.] And in the series of Segregation Cases pending at the time of the second Brown decision [8] orders were entered sending the cases back to District Courts for consideration in the light of "conditions that now prevail."

(b) In acknowledging the fact of District Court discretion and spelling out the

---

4. Hecht Co. v. Bowles, infra, 312 U.S. at page 330, 64 S.Ct. at page 592.

5. Consider, e.g., Aircraft & Diesel Equipment Corp. v. Hirsch, 1947, 331 U.S. 752, 767, 67 S.Ct. 1493, 91 L.Ed. 1796; Myers v. Bethlehem Shipbuilding Corp., 1938, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638; and United States v. Western Pacific R. Co., Dec., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126.

6. Cook v. Davis, 5 Cir., 1949, 178 F.2d 595, certiorari denied 340 U.S. 811, 71

S.Ct. 38, 95 L.Ed. 596; Bates v. Batte, 5 Cir., 1951, 187 F.2d 142; Peay v. Cox, 5 Cir., 1951, 190 F.2d 123, certiorari denied 342 U.S. 896, 72 S.Ct. 230, 96 L. Ed. 671.
  This phase of the question is discussed more fully infra, part V(c) and (d).

7. First Brown opinion, 347 U.S. at page 495, 74 S.Ct. at page 692.

8. Cf. Tureaud v. Board of Supervisors and allied cases, 347 U.S. 971, 74 S.Ct. 784, 98 L.Ed. 1112.

factors which govern that discretion under our constitutional system, the Supreme Court stressed not only the local character of the problem, but the inherently public nature of it. In the first Brown decision, 347 U.S. at page 489, 74 S.Ct. at page 689, it noted that, at the time the Fourteenth Amendment was adopted, "In the South, the movement toward free common schools, supported by general taxation, had not yet taken hold. * * * Education of Negroes was almost nonexistent, and practically all of the race were illiterate." It then proceeded to discuss some of the cases in which efforts had been made to eliminate the disparity existing between schools in the South and those in the North. Fundamental differences were frankly recognized while adverting, at the same time, to the fact that the South had not been alone in practicing the discrimination at which the current decisions were aimed. The important sentences [9] in which it pointed out some of the distinguishing characteristics of the discretion admittedly residing in District Courts read thus:

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a *facility for adjusting and reconciling public and private needs.*" The most important aspect of the principle enunciated in this quotation, and the one which my colleagues seem to leave out of consideration, is the case [10] cited as authority for it and as setting up the standard by which District Courts should be governed in making this adjustment and reconciliation between "public and private needs."

(c) Since Hecht is the decision cited by the Supreme Court as illustrating the principles by which District Courts are governed in the exercise of discretion, it ought to be examined in some detail. It began as an injunction proceeding under the Emergency Price Control Act. Government operatives had spot-checked seven out of more than one hundred departments in the large store of the Hecht Company, and had found in excess of 4,500 violations of price regulations.[11] Nevertheless, the District Court [12] thought that Hecht has manifested good faith and was not likely to commit, in the future, anything more than inadverted violations, and it *felt that the public interests would be served better by refusing an injunction than by granting one:* "If in such circumstances an injunction is asked the court is not deprived of its inherent powers by calling it a statutory injunction. The court in such case retains its implied powers, exercised in a sound discretion. * * * As generally understood judicial discretion includes the propriety of granting appropriate relief. All rules in equity must necessarily be sufficiently elastic to do justice in the case under consideration. Courts of equity are not inquisitorial but remedial.

"* * * each case must be determined upon its facts and on equitable principles. In a case such as this an injunction should not issue unless thereby *better compliance with law may be enforced. Such consideration is addressed to the sound discretion of the court.* * * It is elementary that the purpose of an injunction is to deter rather than to punish. * * * The attitude of the defendant company is not antagonistic but cooperative, and in *my judgment an injunction would not be in the public interest.* * * I conclude that a just result requires a dismissal of plaintiff's complaint * * *." [Emphasis supplied.] The Court of Appeals for the District of Columbia [13] felt that the District Court had misconceived the purposes of the statute and had given too wide a sweep to traditional equity powers, and it set aside the order of the

---

9. Second Brown decision, 349 U.S. 300, 75 S.Ct. 756, 99 L.Ed. 1083.

10. Hecht Co. v. Bowles. 1944, 321 U.S. 321, 329–330, 64 S.Ct. 587, 88 L.Ed. 754.

11. See 137 F.2d 689.

12. 49 F.Supp. 528, 532.

13. Brown v. Hecht Co., 1943, 78 U.S.App. D.C. 98, 137 F.2d 689.

District Court which had refused the injunction. The Supreme Court granted certiorari [14] and reversed,[15] approving the action of the District Court in basing its denial of injunction on the balancing of public interest versus private needs. Here is its language:

"We are dealing here with the requirements of equity practice with a background of several hundred years of history. * * * The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. *The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.* [321 U.S. at page 329, 64 S.Ct. at page 591.]

"* * * We repeat what we stated in United States v. Morgan,[16] supra, respecting judicial review of administrative action: '* * * court and agency are not to be regarded as wholly independent and unrelated instrumentalities of justice, each acting in the performance of its prescribed statutory duty without regard to the appropriate function of the other in securing the plainly indicated objects of the statute. Court and agency are the means adopted to attain the prescribed end, and so far as their duties are defined by the words of the statute, those words should be construed *so as to attain that end through co-ordinated action.* Neither body should repeat in this day the mistake made by the courts of law when equity was struggling for recogni-

tion as an ameliorating system of justice; *neither can rightly be regarded by the other as an alien intruder,* to be tolerated if must be, but never to be encouraged or aided by the other in the attainment of the common aim.' The Administrator does not carry the sole burden of the war against inflation. The courts also have been entrusted with a share of that responsibility.

* * * *For the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief in these cases."* [321 U.S. at pages 330–331, 64 S.Ct. at page 592; emphasis added.][17]

(d) Here, then, is the blueprint suggested by the Supreme Court for the guidance of District Courts in passing upon applications for injunctive relief and in deciding whether the best interest of the public and the private litigant will be served by prolongation of litigation. There can be no doubt that the Supreme Court recognized the paramount public nature of this problem and the duty of the District Courts to decide questions of policy as well as questions of law.

Ordinarily discretion is lodged in a trial judge because he is present and obtains the "feel" of the trial. This includes the attitudes of the parties and their counsel as revealed in the give and take of the courtroom encounter, the advantage of observing the witnesses as they testify and of appraising from their looks and demeanor the weight and probative value of the words they speak.

But the discretion committed to the trial judge in segregation cases has the added ingredient arising from his proximity to and knowledge of local conditions. His judgment is based upon what

14. 320 U.S. 727, 64 S.Ct. 81, 88 L.Ed. 429.

15. Hecht Co. v. Bowles, 1944, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754.

16. 307 U.S. 183, 191, 59 S.Ct. 795, 799, 83 L.Ed. 1211.

17. The same idea was expressed in Virginian Ry. Co. v. System Federation, etc., 1937, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789: "More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, * * * is a matter of public concern. * * * Courts of equity may, and frequently do, go much farther both *to give and withhold relief in furtherance of the public interest* than they are accustomed to go when only private interests are involved." [Emphasis added.]

he knows from his experience as well as what he hears from the witness stand. The broad and comprehensive terms used in the discussed cases are bound to embrace the manifold intangibles and imponderables which necessarily play such an important part in assessing what is the public good and in balancing public interest against private needs.

### III.

(a) This Court has always aligned itself with the universal rule that findings of the trial court must stand unless clearly erroneous and that exercised discretion should not be disturbed unless plainly illegal or unsupported by the evidence.[18] This same disposition to lean heavily upon the district court was manifested in the first decision of this Court applying the Segregation Cases: "A

large measure of discretion, coupled with recognition of judicial knowledge, must be vested in the district judge."[19] But in more recent cases, this Court has apparently been unwilling to accept the findings and approve the discretion of the district courts in such cases.[20]

(b) This apparent change of attitude reflects, in my opinion, a definite departure from the established rules of law recognized as controlling by the Supreme Court in the Segregation Cases as amplified by its decision in the Hecht case. I think it is a mistake for us to attempt to sit in too close chaperonage upon what the district judges do. Unless we are to be given some peculiar powers of divination, we cannot possibly approach the insight which is theirs by reason of their intimate contact with the conditions confronting them.[21]

18. E. g., Mutual Life Ins. Co. of New York v. Ellison, 1955, 5 Cir., 223 F.2d 686; Indiana Lumbermens Mutual Ins. Co. v. James, 1 Cir., 1956, 230 F.2d 500; United States v. Stewart, 5 Cir., 1953, 201 F.2d 135; Bruce v. McClure, 5 Cir., 1955, 220 F.2d 330; and United States v. Smith, 5 Cir., 1955, 220 F.2d 548. And see United States v. W. T. Grant Co., 1953, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303, where the Supreme Court said a chancellor's "discretion is necessarily broad and a strong showing of abuse must be made to reverse it."

19. Concurring opinion of Judge Rives in Board of Supervisors, etc., v. Tureaud, 5 Cir., 1955, 225 F.2d 434, 446–447, adopted by the Court en banc in the same case, 1956, 228 F.2d 895, 896.

20. E. g., Whitmore v. Stilwell (Texarkana Jr. College), 5 Cir., 1955, 227 F.2d 187; Brown v. Rippy (Dallas Independent School Dist.), 5 Cir., 1956, 233 F.2d 796; and Jackson v. Rawdon (Mansfield High School), 5 Cir., 1956, 235 F.2d 93.

21. For example, the action of the District Judge in the Mansfield School case was based, in my opinion, on a clear comprehension of the many-sided problem with which he was dealing and he exercised wisdom and discretion in fashioning the decree to accomplish what was best for the public as well as the litigants. Three Negro boys had applied for admission to the Mansfield High School a month after classes had been begun. The District

Judge, acting in obedience to the teachings of the Supreme Court in the Hecht case, denied the injunction because he felt that more good could be accomplished by so doing than by granting injunction. Here, in part, are the reasons assigned by him for denying the injunction:

"In finding the equities between the parties, I see on the one hand, the situation of this rural school board composed primarily of farmers, agents of the State of Texas * * * opening their meetings with prayer for solution; studying articles in magazines and papers; holding numerous meetings; passing resolutions and appointing a committee to work on a plan for integration—making the start toward 'obeying the law' which their abilities dictated. Further, the trustees now assure the Court that they are continuing their efforts and will work out desegregation. Their committee conferred with these plaintiffs in the presence of plaintiffs' parents, and accepted and fulfilled the request made by plaintiffs with their attorney in August, 1955 for certain administrative steps as a solution for this period of transition, * * *. After the accomplishment of these administrative steps taken at the request of plaintiffs, and after school had been in session more than a month, this action was filed. * *

"After the accomplishment of the above mentioned administrative processes at plaintiffs' request, and after school had begun, it appears to the Court that the issuance of an injunction to effect entrance into Mansfield High School at this

(c) The Court below in this case, alive to local conditions, acquainted with local needs and with the human beings bearing primary responsibility with respect to them; and observing the demeanor, as witnesses, of the public servants entrusted with the operation of a public school system for the good of all of the people, felt that more would be accomplished if the cudgels of conflict should be dropped, and men of good will should be encouraged to discuss and compose their differences in an atmosphere permeated as little as might be by animosities. He concluded apparently that an ounce of cultivated magnanimity and forebearance might be worth more than a pound of coercion.

## IV.

Projected against this background of legal principles, this case seems to me quite simple and easy of solution. I think the Court below handled it well, decided it correctly, and that we should uphold its wise action in all respects.

(a) A group of Negro children desired to enter Barwise School and, at the beginning of the school year, presumably went there to matriculate. They were told that they would be permitted to enter this school as soon as the pupils then attending it could be moved to Sunnyside Heights School, then in course of construction. It was estimated that this shift could take place in about six weeks.[22] Announcement of the completion was made on Christmas Day and all of plaintiffs were admitted to the Barwise School (its name having been changed to Holland) upon convening of the second term in January.

(b) Meantime, about two weeks before the announcement was made, this civil action was begun. It was predicted solely upon the fact alleged in the complaint that Barwise was the school nearest plaintiffs' homes. Alfred Avery, the only plaintiff concerning whom proof was made, lived about six blocks from the school. Plaintiffs and their attorney knew when the action was begun that all of the relief sought would be given administratively without litigation long before the case could possibly be brought on for hearing.

This action was begun solely because plaintiffs' attorney did not trust the school board, and did not think it was proceeding in good faith. Appellants' brief and oral argument abundantly demonstrate this, and the frequent colloquies between their attorney and the Court bring it into bold relief.[23]

Barwise was a small school with ten classrooms and a capacity of less than three hundred pupils. There were one hundred forty Negroes whose residences would entitle them to claim admittance to Barwise. All of them could not be accommodated and the school board could not practice discrimination in favor of plaintiffs and against the residue, or against the pupils already enrolled therein.

(c) The Trial Judge considered the affidavits and had the benefit of the testi-

---

time would be unjust to the school trustees and the students alike. * * *

"It is impossible, however, simply to shut our eyes to the instant need for care and justice in effectuating integration. The directions of the United States Supreme Court allow time for achieving this end. While this does not mean that a long or unreasonable time shall expire before a plan is developed and put into use, it does not necessitate the *heedless and hasty use of injunction which once issued must be enforced by the officers of this Court, regardless of consequences to the students, the school authorities and the public.* This school board has shown that it is making a good faith effort to-

ward integration, and should have a reasonable length of time to solve its problems and end segregation in the Mansfield Independent School District." [Emphasis added.] 135 F.Supp. 936, 937.

22. Shortage of steel resulting from the steel strike, together with heavy rains and two floods, brought about a delay in the completion of the new school.

23. At one point the Court said to plaintiffs' attorney: "You have misgivings, I am sure, from what has been said * * [but] personally I have strong faith in the good intentions and good faith of the school board. * * * "

mony of one of plaintiffs' parents and of members of the school board. He found that it was not unreasonable to defer the applications of plaintiffs for a few weeks until the physical plants of the school could be altered to meet the new demands; and felt, too, that the school board had wrestled with its vexing problems in a spirit of fairness and good faith and that an injunction or the continued pendency of the suit would serve no good purpose, but would do harm. The following quotation from the Judge's opinion sets forth what was behind his judgment:

"The Supreme Court * * * has recognized very clearly the practical reality that the primary responsibility in this progress of desegregation rests on the local school boards, those nearest to its problems in its local aspects, and that's where it should be properly, so long as local officials demonstrate the attitude to solve the transition * * * with reasonable dispatch. It is of supreme importance that the work should proceed peaceably in this undertaking * * *

"But the impression I have from what has been presented during the hearing today is that the Board and officials of this School District seem to be men of good will and have set their policy toward the integration of this new educational policy and with that attitude in mind I think it would be premature for courts to interfere. Impatience and precipitancy of spirit are not, I am convinced, nearly so reliable a course as that of depending upon these authorities, once you have substantial evidence that they are acting in good faith and with a real and honest purpose to go ahead and without dragging the plans by any unnecessary or vexatious breaks along the way.

"I have the faith in this School Board that they will measure up to the responsibilities and the plans that have been declared in their behalf here today through their Superintendent and Secretary of the Board and the recorded minutes and by the words of their counsel. * * I believe it would be a disservice to step in at this time and undertake to compel and direct the business of these men under the power of the Court."

The judge who spoke these words had seen the witnesses as they testified, had acquired the "feel" of the case as it unfolded before him; and he demonstrated in his grasp of the problem a wisdom, a patience and a tolerance which invest his words with commanding convictive force. More than that, he was born and had spent his days in close proximity to the locale of this controversy and had an intimate acquaintance with the conditions with which he was dealing. We, who assume to pass upon the wisdom of his discretion, have lived our lives hundreds of miles away from that locale. The trial judge, following the holdings of Brown and Hecht, felt that more would be accomplished by denying the injunction and removing the case as a constant irritant than by granting the injunction or retaining the case. When we substitute our judgment for his, a lack of perspective is demonstrated along with a definite dissonance with the teachings of the Supreme Court.

### V.

It remains, therefore, but to examine the majority opinion to test the reasons upon which the reversal is predicated.

(a) While conceding that the Court below did not err in refusing declaratory and injunctive relief, the opinion intimates that the school board was guilty of some illegal action.[24] In fact, what is said concerning mootness is predicated necessarily on the assumption of illegal action and on doubt concerning the good faith of the school authorities. The opinion does not point to any facts which

---

24. Such phrases occur in the opinion as "voluntary cessation of illegal conduct," and "no reasonable probability of a return to the illegal conduct."

would furnish the basis for a charge of illegal conduct. Every plaintiff who applied for admission to the Barwise School had gained that admission by administrative action before the trial and there never had been any doubt about the purpose of the school board to comply with the requested admission as soon as physical properties could be changed to meet the new conditions. The timing and other details of the transfers were matters committed to administrative action and the Court was without jurisdiction to intervene in any event unless and until bad faith was shown. United States v. Western Pac. R. Co., supra.

(b) The opinion takes note of the suspicions voiced by plaintiffs' counsel that the school board did not intend to do in the future what they solemnly swore they were going to do. The opinion states, "but it is by no means certain that they [i. e. the Negroes] had the same free privilege of transfer to or attendance on any school of their choice as was accorded the white children." Such a reference tends to give substance to the suspicions voiced by plaintiffs which, in my opinion, were without the slightest foundation in the evidence. The fact is that the school board had gone "the second mile" both in action and in purpose in the discharge of its duties and the Trial Judge so thought.

(c) This disposition of the majority to characterize the actions of the school board as illegal because the board did not practice precipitate action to grant the plaintiffs the piecemeal relief they sought the minute it was demanded, based upon its concept that it must look to the public interest as well as plaintiffs' and must deal with the problem in its larger aspect; and to sanction court intervention before the administrative function had been given opportunity to express itself, calls for further discussion of this feature of the problem.

(d) There seems little doubt that the scheme approved by the Supreme Court contemplates that school boards shall have exclusive jurisdiction in making the adjustments brought about by the Segregation Decisions, i. e. in "elucidating, assessing and solving these problems;" and that courts have jurisdiction to intervene only after the administrative process has been exhausted (We leave out of view for the moment the question of bad faith, which certainly is not present here). The Supreme Court has at the current term, reiterated the rule: [25] "The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. *Exhaustion* applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course." (Emphasis added.)

This Court has declared unequivocally that this principle applies to school boards dealing with charges of discrimination based upon assertion of Fourteenth Amendment rights, Bates, v. Batte, supra, 5 Cir., 1951, 187 F.2d 142, et seq:

"The defendants moved to dismiss * * * because plaintiffs had not first exhausted their administrative remedies provided by Mississippi administrative statutes governing education and controversies arising in and about schools. This motion * * * was denied * * *. After the case had been tried, but before it was decided below this court, in Cook v. Davis, 5 Cir., 178 F.2d 595, a negro school teacher salary case * * * held, in a thoroughly considered and carefully reasoned opinion, that until plaintiffs had exhausted their administrative remedies provided by Georgia laws governing education and controversies arising under school laws, they could not maintain their suit.

"The District Judge, of the opinion * * * that the present suit could not be maintained until the available

25. United States v. The Western Pacific R. R. Co., et al., supra [352 U.S. 59, 77 S.Ct. 165].

remedies provided by state law had not [sic] been first exhausted; said so in an opinion * * * [and] a judgment dismissing the complaint without prejudice was entered * * *. [187 F.2d at page 143.]

"* * * it is sufficient for us to say that we regard the case of Cook v. Davis as thoroughly considered and well decided and that the statutes of the two states are sufficiently alike to make the decision in Cook's case dispositive of the appeal. The judgment of dismissal for failure to exhaust administrative remedies was right, it is affirmed."

The Cook case had held, 178 F.2d at page 600: "The broad principle that administrative remedies ought to be exhausted before applying to a court for extraordinary relief, and especially where the federal power impinges on State activities under our federal system, applies to this case. 'No one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.' Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, at page 50 [58], 58 S.Ct. 459, at page 463, 82 L.Ed. 638, citing many cases relating to relief by injunction. We held in Bradley Lumber Co. [of Arkansas] v. National Labor Relations Board, 5 Cir., 84 F.2d 97, that the same principle applies to relief by declaratory decree."[26]

(e) In my opinion, what the majority orders to be done here, as well as what this Court ordered in the cases listed in footnote 20, supra, offends directly against these recognized principles. By putting this Court in conflict with the Supreme Court in the respects discussed—in which attitude, in my opinion, we have exhibited less sympathetic understanding of the complex problems facing school boards in the South than that shown by the Supreme Court—we invite the District Judges, under oath "to support and defend the Constitution," to base their decisions on their own conscientious convictions of what is constitutional and right under the facts of the cases coming before them.

## VI.

(a) The action of the majority in sending this civil action back with instructions to keep it open on the docket is, in my opinion, without warrant in law or in fact. The idea seems to be that it may serve as a rallying point for plaintiffs or others if their distrust of the school board should prove well founded—that other situations in other schools may be dealt with in this suit. The obvious answer to this attitude is that relief which may be granted in this suit can never rise above the facts pleaded as the basis for that relief.[27]

The sole factual predicate for action here was the assertion that plaintiffs were entitled to attend Barwise School because it was nearest their homes. That right was vouchsafed them long before the case was tried, and there is nothing to be litigated under the facts alleged. No life can be breathed into the case by seeking to tack onto it claims for different relief based upon different facts which may arise in the future.

Much was said in the argument about the right to transfer from one school to the other. Of course, the right to transfer is single, belonging to each individ-

**26.** Other Courts of Appeal are currently applying this principle to segregation cases coming before them. See, e.g., Carson v. Board of Ed. of McDowell County (N.C.), 4 Cir., 1955, 227 F.2d 789; and Hood v. Board of Trustees of Sumter County (S.C.), 4 Cir., 1956, 232 F. 2d 636, certiorari denied 352 U.S. 870, 77 S.Ct. 95, 1 L.Ed.2d 76.

**27.** Cf. Indemnity Ins. Co. of North America v. Moses, 5 Cir., 1929, 36 F.2d 219;

6 Moore, Par. 54.62, p. 1208, and 2 Moore, Par. 3.13, p. 1653 and 1954 Cumulative Supplement, p. 107; and cf. Sylvan Beach v. Koch, 8 Cir., 1944, 140 F.2d 852, 861–862.

Rule 54(c) enlarges the *relief* which may be granted beyond the askings of prayer for relief; but it does not permit relief to be granted beyond that justified by the facts pleaded and proved. Thomas v. Pick Hotels Corporation, 10 Cir., 1955, 224 F.2d 664, 666.

ual. A court would not have jurisdiction to intervene until such individual had exhausted administrative remedies. This rule is made clear in the decision of the Court of Appeals for the Fourth Circuit in Carson v. Warlick, 238 F.2d 724, 729. "There is no question as to the right of these school children to be admitted to the schools of North Carolina without discrimination on the ground of race. They are admitted, however, as individuals, not as a class or group; and it is as individuals that their rights under the Constitution are asserted. * * It is the state school authorities who must pass in the first instance on their right to be admitted * * *."

(b) The majority opinion seems to infer that, because plaintiffs alleged that they were bringing a class action, other undisclosed persons might utilize the present suit to bring up new facts and ask new relief. That would not be possible even if this were in any proper

sense a class action, which, in my opinion, it is not.

In the first place, plaintiffs never purported to represent anybody but persons having a claim to attend Barwise School based solely upon their contiguity thereto. It is true that they made the general assertion that they spoke for others of their class. But the defendants in their pleadings denied that there was any such class, or that plaintiffs qualified as spokesmen for any class. This created an issue of fact with respect to which plaintiffs bore the burden and no proof at all was offered. The mere *ipse dixit* of the author of the complaint can, of course, avail plaintiffs nothing.[28]

(c) The majority opinion seems further to treat the action as a "true" class action, and to invest it with an outreach broad enough to encompass all of the rights of all of the pupils in all of the schools in the Wichita Falls Independent School District.[29] But plaintiffs have

---

28. Lion Bonding & Surety Co. v. Karatz, 1923, 262 U.S. 77, 43 S.Ct. 480, 67 L.Ed. 871; Hansberry v. Lee, 1940, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22; McClelland v. Rose, 5 Cir., 1918, 247 F. 721, 724; 3 Moore's Federal Practice, pp. 3418 et seq., 3422 and 3423; and 39 Am.Jur., Parties, § 53, pp. 926, et seq.

29. The only possible source of such an idea is the statement of plaintiffs' counsel to the Trial Court: "This is a broader suit than just these twenty-four plaintiffs. This is a class action * * * for a determination of how all the schools in this district shall be administered * *" But there is no syllable of proof tending to establish that counsel had any authority to speak for such a class or even for any plaintiff except the one who testified. And the Court would not be tempted, if otherwise justified, to indulge any presumptions in favor of the authority of plaintiffs' counsel in view of his recent experience in a District Court in Texas.

He had filed a motion on behalf of two minors by their parents to intervene for the purpose of citing the defendants for contempt of court in Civil Action No. 366, D.C.E.D.Texas, Texarkana Div.; Wilma Dean Whitmore, et al. v. H. W. Stilwell, President of the Texarkana Junior College, et al. (see footnote 20, supra) and his authority to represent the

two complaining intervenors had been challenged.

When called to the witness stand in that case he admitted that he had never been employed by the complaining minors or their parents, had never seen them until the day of the trial, and that his authority to represent them had come exclusively through intermediaries essaying to speak for them. A portion of the colloquy following his testimony and that of the two minors at the hearing of September 27, 1956 follows:

"Mr. Tate: May it please the Court, I would like to move the Court to dismiss this suit with respect to this petitioner and ask that they both be dismissed without prejudice so if they want to hire another lawyer, they may.

"The Court: You mean you are disqualifying yourself?

"Mr. Tate: Yes, sir.

"The Court: Your motion will be granted. * * * Now, just a minute, there has been some testimony here that this Court cannot overlook. And in making this statement that I am going to make, I want to say that as far as this Court is concerned, this type of lawsuit stands on the same basis as any other lawsuit filed in this Court and there are certain rules and demeanor that the attorneys of this bar must follow. I would suggest to you, Mr. Tate, that in the future if

never in their complaint aspired to the maintenance of a "true" class action, categorically limiting by specific averments, the class action they sought to bring to that provided in Rule 23(a) (3) F.R.C.P., commonly referred to as the "spurious class suit." 3 Moore, pp. 3442 et seq., and 3456.

The distinction is quite important as, in a true class suit, all members of the class are bound by the judgment.[30] On the other hand, the spurious class action is merely a permissive joinder device, and the judgment binds only "those parties actually before the court." Martinez v. Maverick County Water Control, etc., District, 5 Cir., 1955, 219 F.2d 666, 672.

(d) The majority, in my opinion, misconceives the character of this proceeding. The judgment rendered by the Court below was a summary judgment on the merits and completely disposed of all of the issues raised by the pleadings and the testimony. After filing their answer defining all of the issues raised in the case, defendants had moved the Court "to dismiss the action because the complaint fails to state a claim against defendant upon which relief can be granted, or in the alternative to grant summary judgment for defendant under Rule 56, * * *." The motion was supported by affidavits.

Plaintiffs moved to strike that motion because it was in the alternative (which motion the Court below denied), but requested "the right to take testimony on these issues and particularly to examine the defendants Joe B. McNeil

and Leroy Stone with respect to the allegations made in their affidavits." The matter proceeded to hearing upon full oral testimony and all parties considered it as a hearing on the merits as is clearly reflected in the arguments and in the colloquies between the Court and counsel. The Court entered detailed findings of fact on every issue presented, and there is no room for the contention that there was any dispute in the testimony, or any material issue as to the facts. The order entered by it, regardless of the label put upon it, was an order for summary judgment[31] which is a final disposition of the case on the merits and there is nothing left to remand.

## VII.

In my opinion, even if we were vested with a discretion, we ought to follow the course so clearly sanctioned in the Supreme Court decisions, by approving the conciliatory action of the Court below in what appears to me to be a wise, tolerant and educated judgment. The net result of the course the majority now commands is to leave the whole delicate problem in the realm of controversy, to invest the participants with the trappings of combat, and to invite prolongation of the struggle. It arms one party with a weapon carefully leveled at the other, inviting one to put the weapon into operation, compelling the other to engage itself in protective measures.

This course represents, in my opinion, a strategic mistake of real magnitude. Practically every responsible person in a place of public leadership has stated that this problem will be solved only as men's

---

you expect to appear in this Court in connection with any of these cases or any lawsuit, regardless of what it is, that you be sure that you are properly employed in the case. * * *

"Mr. Tate: I want the Court to know I appreciate very much the situation. * * *"

30. Hansberry v. Lee, supra; Weeks v. Bareco Oil Co., 7 Cir., 1941, 125 F.2d 84, 93, and cf. Troup v. McCart, 5 Cir., 1956, 238 F.2d 289.

31. Rule 12(b) F.R.C.P. provides:

"If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, * * *."

And see Slagle v. United States, 5 Cir., 1956, 228 F.2d 673, and authorities therein cited; and 2 Moore's Federal Practice, p. 2256, and 1954 Cumulative Supplement, p. 148.

hearts are reached and touched. Weapons have never changed the human spirit, or fomented good will, and the threat of force they carry has never nurtured brotherhood. To tempt one litigant to keep his eyes glued to the gunsight, thus provoking the other inevitably to divert most of its energies from constructive and probably generous action to preparations for defense, is to perform a distinct disservice to both and, more important, to the public.

The Supreme Court has recognized as imposed upon the District Courts responsibilities of statesmanship in addition to the duty to pass upon legal points. Judicial fiats are not self-executing. It would be well if we should pause to ponder upon these words written by Mr. Justice Jackson in the last days of his life:[32]

"It is not idle speculation to inquire which comes first, either in time or importance, an independent and enlightened judiciary or a free and tolerant society. Must we first maintain a system of free political government to assure a free judiciary, or can we rely on an aggressive, activist judiciary to guarantee free government? While each undoubtedly is a support for the other, and the two are frequently found together, it is my belief that the *attitude of a society and of its organized political forces, rather than its legal machinery,* is the controlling force in the character of free institutions. * * *

"Judicial functions, as we have evolved them, can be discharged only in that kind of society which is *willing to submit its conflicts to adjudication and to subordinate power to reason.* * * *." [Emphasis supplied.]

Those words fit well into the admonition of the Supreme Court in Hecht that co-ordinated action between administrative body and Court is an absolute es-sential to the successful functioning of either; and that it is of supreme importance that neither shall look upon the other,—and that the public shall look upon neither,—as an "alien intruder." By leaving the problem before us in litigation, we contribute towards reducing it to a level which assumes that it possesses only a horizontal dimension. The truth is that the vertical dimension is of transcendent importance.

32. The Supreme Court in the American System of Government, by Robert H. Jackson, pp. 81 and 82-3.