**Queen COHEN, Appellant,**

v.

**PUBLIC HOUSING ADMINISTRATION et al., Appellees.**

No. 16863.

United States Court of Appeals
Fifth Circuit.

June 30, 1958.

Rehearing Denied Aug. 11, 1958.

Constance Baker Motley, A. T. Walden, Atlanta, Ga., Thurgood Marshall, New York City, for appellant.

Shelby Myrick, Sr., George C. Heyward, Myrick, Myrick & Richardson, Savannah, Ga., for appellee Housing Authority of Savannah.

George Cochran Doub, Asst. Atty. Gen., Paul A. Sweeney, Donald B. Mac-Guineas, Attorneys, Department of Justice, Washington, D. C., for appellee Public Housing Administration.

Before RIVES, BROWN and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

The complaint was originally brought by eighteen Negro residents of Savannah, Georgia for an injunction, declaratory judgment and money damages on account of racial segregation in public housing in that City, allegedly enforced by the Public Housing Administration (hereinafter called P.H.A.) and the Housing Authority of Savannah (hereinafter called S.H.A.). Earlier orders of the district court dismissing the action [1] were affirmed in part and reversed in part and remanded.[2]

After remand, but prior to the commencement of trial, seventeen parties plaintiff voluntarily withdrew,[3] leaving the appellant, Queen Cohen, as the sole plaintiff. At the conclusion of the trial, the district court found as a fact, inter alia, that "Queen Cohen never made an application for admission in the Fred Wessels Homes or any other public housing project in Savannah."

The appellant's first specification of error is that:

"The trial court erred in dismissing appellant's suit, after a full trial on the merits, on the ground that appellant failed to prove that she had ever made application for admission to Fred Wessels Homes."

The complaint alleged that: "Each of the plaintiffs has been denied admission to Fred Wessels Homes solely because of race and color." In their answer, the defendants denied "that these defendants have determined upon and presently enforce an administrative policy of racial segregation in public housing in the City of Savannah, Georgia," and denied the allegation that "Each of the plaintiffs has been denied admission to Fred Wessels Homes solely because of race or color." The evidence showed that P.H.A. was operating under its regulation quoted in full in our former opinion,[4] which requires that:

"Programs for the development of low-rent housing, in order to be eligible for PHA assistance, must reflect equitable provisions for eligible families of all races determined on the approximate volume of their respective needs for such housing." (PHA Housing Manual, Section 102.1)

Its policies and practices were more fully described in the testimony of Mr. Silverman, its Assistant Commissioner for Management, quoted in the margin.[5]

1. Heyward v. Public Housing Administration, D.C.S.D.Ga.1955, 135 F.Supp. 217.

2. Heyward v. Public Housing Administration 5 Cir., 1956, 238 F.2d 689.

3. Mr. Stillwell, Secretary and Executive Director of S.H.A., testified upon the trial that none of those seventeen had ever applied for admission to Fred Wessels Homes; that fifteen of them had applied for and been admitted to another project, Fellwood Homes; and that two had never applied for any kind of housing.

4. Heyward v. Public Housing Administration, 5 Cir., 1956, 238 F.2d 689, at page 697.

5. "Q. Now, what are the policies and practices of the Public Housing Administration with respect to racial occupancy of low-rent housing projects? A. It is the policy of the Public Housing Administration to assure that equitable treatment is afforded to all eligible families in a locality, and that all eligible families who are admitted to housing projects by housing authorities are treated equally with respect to income limits or rents to be charged and other conditions of occupanys (sic).

"Q. What is the policy and position of the Public Housing Administration with respect to low-rent housing projects in Savannah or elsewhere as to whether or not they are operated by the Local Authority on a segregated or non-segregated basis? A. We have not required Housing Authorities to either segregate or non-segregate in housing projects. We have required that the housing pro-

---

The Housing Authority of Savannah operated, or had under construction, 2170 dwelling units of which 1120 were designated for Negro occupancy and 1050 for white. The project known as Fred Wessels Homes was intended for white occupancy, but Mr. Stillwell, the Secretary and Executive Director of S.H.A., denied in his testimony that Negroes had ever been refused admission to that project.[6] At the same time, Mr. Stillwell candidly admitted that his hope for success of a program of public housing for people unable to pay the cost of decent and adequate private housing lay in the maintenance of actual segregation.[7]

gram in every locality be available to all segments of the eligible low income families in that locality. We have not prescribed the precise fashion in which the Housing Authority shall extend that equality of treatment to the residents of the locality.

"Q. Is that policy based on your interpretation of the requirements and policies of the Housing Act itself? A. Yes. It is based upon our construction of the United States Housing Act and particularly the 1949 Housing Act Amendment. The very act which created the preferences that have been discussed here, the preferences extended to displaced families, when it was being considered in the Congress, in the Senate, a motion was made to attach a non-segregated requirement to the statute. That was defeated. It is our view that that action was Congressional recognition of the fact that local practices vary in the United States, and that some Local Authorities did maintain separate projects by race and other integrated, but the failure to enact a specific congressional prohibition against it was recognition that a variety of practices might prevail.

"Q. With respect to the low-rent housing program throughout the country, that is, those projects to which PHA gives financial assistance to what extent has there been integrated occupancy as to those projects? A. As of December 31st, last, which is the last statistical tabulation we have, on 445 projects, approximately, containing some 163,000 dwelling units, representing about 43 percent of the entire program, were operated on an integrated basis.

"Q. Would there be any objection on the part of the Public Housing Administration if the Savannah Housing Authority, or any other Local Authority, were to determine to operate a low-rent housing project on integrated basis? A. None whatsoever."

On cross-examination, Mr. Silverman testified:

"Q. Now, I believe you stated that your Agency interpreted the defeat of the anti-discrimination with respect to the Public Housing bill as an authorization from Congress that you and your Agency might approve segregation or integration in any particular Local Authority, or any particular locality that a Housing Authority might want to practice in public housing. Is that right? A. Mrs. Motley, I don't mean to quibble with you, but we didn't recognize it as that kind of an authorization. We recognized it as Congressional recognition of the fact that practices varied among the various localities in the country with respect to the low-rent housing."

6. "Q. Well, were you taking applications from negroes for the Fred Wessels Homes at anytime? A. For occupancy in there?

"Q. Yes. A. No. I have never been asked to do so. We have never had an application from a negro for occupancy in any white project and by the same token we have never had an application from a white man to go into a negro project. We have never had that to come up.

"Q. If a negro applied for admission to the Fred Wessels Homes would you put him in there? Is that what you are saying? A. No. He would be given consideration, but I don't know what I would do.

"Q. You wouldn't put him in there, would you? A. I don't know what I would do. I have never had the question to come up.

"Q. You know that this case is concerning your refusal to admit negroes to the Fred Wessels Homes? A. Yes, but we have never refused to take them in there."

7. "A. Well, as you know, our white projects are predominately (sic) occupied by what is generally known as 'Georgia Crackers', and you know that he would never consent to occupy a home adjacent to or mixed up with the colored families. Consequently, it would mean that the white projects would eventually be overwhelmingly negro, if not a 100 percent negro, and the average income of the negro is less than the average income of the white population of that same caliber, and consequently the average rent per unit would be much less and it is a question in my mind whether the

The appellant did not claim that she had filed any written application. Her testimony was that she went to make her application "around 1952, during the time I had to move," that the building of the Fred Wessels Homes had then been completed, but "It was empty and I didn't know who was going to take it, white or colored, and so I went to apply for one." She testified that she went to the office of the Fred Wessels Project.[8] Mr. Stillwell, the Secretary and Executive Director of S.H.A., and Millard Williams, an employee of S.H.A. from 1951 to 1955, were brought into the courtroom for purposes of identification. The appellant was unable to identify either of them as the one with whom she had talked.[9]

Appellant testified that her cousin, Susie Parker, had accompanied her when she went to make her application. When Susie Parker came to testify, she positively identified Millard Williams as the one with whom the conversation took place.

In rebuttal, both Stillwell and Williams denied having had any such conversation, or ever having seen the appellant or her cousin prior to the trial. Mr. Stillwell testified further that the Fred Wessels Homes had not even been built in 1952, that there were then no buildings on the site.

Stillwell and Williams denied that there had been any application or attempt to apply for admission to Fred Wessels Homes specifically on the part of any one of the eighteen original plaintiffs, and generally on the part of any other negro. None of the seventeen other original plaintiffs testified in rebuttal, nor was any reason given for their failure to testify.

■ The district court had the advantage of seeing and hearing the witnesses, while this Court may only read their testimony. Upon the present record, it is an understatement to say that the pertinent fact-finding by the district court does not appear to be clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

■ That, however, is not the end of this case, for appellant next contends

---

rents would maintain the property and pay off its debts.

"Q. In other words, do I understand you to say that if colored people were allowed to come into the white units the white people would move out? A. That's right.

"Q. And there would not be sufficient eligible colored people to occupany the units sufficient to pay the amount due on the debt of that particular property. Is that right? A. Yes, and when I say that I mean sufficient eligible of the higher groups of rents. We have to have a certain percentage of tenants who pay a minimum rent of $15.00 and graduate on up so as to average down to enough to meet the expenses plus the subsistive to retire the principal and interest on the notes and bonds as they mature, and with this lessened income I question whether there would be enough to meet all the obligations.

"Q. And there could be a default, in your payments? A. Yes, that's right, the bonds, and another thing it would break down the racial equity.

"Q. Explain what you mean by breaking down the racial equity? A. Well,

that's the point that Miss Motley has been trying to bring out, that if it was turned into all colored then the white eligible tenants would be deprived of their occupancy of the white projects and we would default in our contract with the PHA because we did not maintain a racial equity."

8. "When I went into the office I met a clerk boy, and so I told him that I wanted to apply for a house there. He took me upstairs. When I got upstairs he showed me a room and in that room were two white ladies, and so I asked them could I put in for a house there. She took me to another office where there was a white man sitting there. The white woman told me to explain it to this man, and so I explained to him, I said, 'I came to put in for a house.' He said, 'Negroes are not allowed here. Go to Fellwood.' That was his remarks to me and so I turned around and walked out."

9. "Q. It was this man here? Is that him? A. I wouldn't say, but he was a slender built man. I only saw him once and then for about three minutes."

that she was not required to prove that she applied for or was denied such admission because equity does not require the doing of a vain act. Appellant argues that similar acts have been held to be vain in cases involving governmentally enforced racial segregation, citing School Board of City of Charlottesville, Va. v. Allen, 4 Cir., 1956, 240 F.2d 59, and Gibson v. Board of Public Instruction of Dade County, 5 Cir., 1957, 246 F.2d 913.

School Board of City of Charlottesville, Va. v. Allen, supra, involved actions in behalf of Negro school children to enjoin School Boards from enforcing racial segregation. Applications had been made to the Boards to take action toward abolishing the requirement of segregation in the schools, and no action had been taken. The Boards contended that, before the plaintiffs would be entitled to injunctive relief, they must have individually applied for and been denied admission to a particular school. The Fourth Circuit, speaking through the late Chief Judge Parker, said:

"* * * The answer is that in view of the announced policy of the respective school boards any such application to a school other than a segregated school maintained for Colored people would have been futile; and equity does not require the doing of a vain thing as a condition of relief." School Board of City of Charlottesville, Va. v. Allen, supra, 240 F.2d at pages 63, 64.

The situation was almost identical in Gibson v. Board of Public Instruction of Dade County, supra. The plaintiffs had petitioned the Board of Public Instruction to abolish racial segregation in the public schools as soon as practicable, and the Board had refused. Relying upon and quoting from Chief Judge Parker's opinion in the City of Charlottesville Case, supra, this Court held that: "Under the circumstances alleged, it was not necessary for the plaintiffs to make application for admission to a particular school." 246 F.2d at page 914.

■ At least two material distinctions exist between those cases and the present case: First, in each of those cases the plaintiffs had placed themselves on record as desiring practically the same relief as that sought from the court. Here, in the absence of any attempt to apply for admission to the Fred Wessels Homes, there is no reasonably certain proof that the appellant actually desired in some earlier year, say 1952, to become a tenant in that public housing. Testimony, years after the critical event, as to what one's intentions were cannot take the place of acts done at that time. Secondly, in each of the cases relied on, it was admitted that discriminatory segregation of the races was being enforced by the defendant Board, while, as has already been indicated, in the present case, in both the pleadings and the proof, governmentally enforced segregation is denied.

In her reply brief, the appellant cites a third case in support of her contention that she was not required to prove that she applied for or was denied admission to the public housing project, Staub v. City of Baxley, 1958, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302. The pertinent holding in that case was thus expressed:

"The first of the nonfederal grounds relied on by appellee, and upon which the decision of the Court of Appeals rests, is that appellant lacked standing to attack the constitutionality of the ordinance because she made no attempt to secure a permit under it. This is not an adequate nonfederal ground of decision. The decisions of this Court have uniformly held that the failure to apply for a license under an ordinance which on its face violates the constitution does not preclude review in this Court of a judgment of conviction under such an ordinance. Smith v. Cahoon, 283 U.S. 553, 562, [51 S.Ct. 582, 585, 75 L.Ed. 1264]; Lovell v. City of Griffin, 303 U.S. 444, 452, [58 S.Ct. 666, 669, 82 L.Ed. 949]. 'The Constitution can hardly

be thought to deny one subjected to the restraints of such an ordinance the right to attack its constitutionality, because he has not yielded to its demands.' Jones v. City of Opelika, 316 U.S. 584, 602, [62 S.Ct. 1231, 1242, 86 L.Ed. 1691], dissenting opinion, adopted per curiam on rehearing, 319 U.S. 103, 104, [63 S.Ct. 890, 87 L.Ed. 1290]." Staub v. City of Baxley, supra, 355 U.S. at page 319, 78 S.Ct. at page 280.

Clearly, that decision is not applicable here, for in that case the appellant had a legal right to engage in the occupation regardless of the ordinance, while here a tenant could not be admitted to a housing project without having made an application. No one could reasonably contend that by applying for admission to a public housing project the appellant would be yielding to any unconstitutional demand.

■ We conclude that the appellant-plaintiff has no standing to maintain this action when she has not been denied admission to a public housing project on account of her race or color. That is the very gist of her claim. Absent such standing, there is no justiciable claim or controversy.[10]

■ Mr. Stillwell's testimony has been noted (footnote 7, *supra*) to the effect that in his opinion actual segregation is essential to the success of a program of public housing in Savannah. If the people involved think that such is the case and if Negroes and whites desire to maintain voluntary segregation for their common good, there is certainly no law to prevent such cooperation. Neither the Fifth nor the Fourteenth Amendment operates positively to command integration of the races but only negatively to forbid governmentally enforced segregation.[11]

The judgment of dismissal is

Affirmed.

10. Associated Industries of New York v. Ickes, 2 Cir., 1943, 134 F.2d 694, 700.

11. Cf. Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F.2d 230, 233; Rippy v. Borders, 5 Cir., 1957, 250 F.2d 690, 692.